UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRUEEX, LLC, and TRUEPTS, LLC <br><br> Plaintiffs, <br><br> -against- <br><br> MARKITSERV LIMITED, AND MARKITSERV, LLC. <br><br><br> Defendants. | Civil Action No.: _____ <br><br> **VERIFIED COMPLAINT** |

Plaintiffs trueEX, LLC ("trueEX") and truePTS, LLC ("truePTS") (together, "Plaintiffs"), for their Verified Complaint against Defendants MarkitSERV Limited and MarkitSERV, LLC (together, "MarkitSERV"), state as follows:

## NATURE OF THE ACTION

1.      This is a case about a monopolist—MarkitSERV—that terminated an essential service in order to destroy a competitor that was on the verge of launching a new company that would loosen MarkitSERV's grip over the critical market for trade processing services for over-the-counter trading of interest rate swaps ("IRS trade processing").

2.      Interest rate swaps ("IRS") are agreements between two counterparties in which one stream of future interest payments is exchanged for another based on a specified principal amount.  Trillions of dollars in swaps (in notional value) are traded each day.

3.      IRS trade processing involves all the things that must happen to complete a transaction after an IRS trade has been executed.  Historically, these tasks include matching buyer and seller records, confirming the terms of trades, allocating aggregated trades among accounts, clearing, reporting, and managing other "life-cycle" events such as trade amendments,

1

assignments, and payments. Firms strive to automate these processes, so that trades are managed throughout their lifecycle without the need for human intervention, in as close to real-time as possible—an objective known as "straight-through-processing," or STP.

4.      STP is an absolutely essential service; it is the only way a firm can automatically update its trading databases to reflect its current financial and risk exposures. STP allows firms to examine their active trades, the current margin requirements, and the economic impact of recent trades, such as cash transactions for the purchase and sale of trades with close to no lag time, and its overall risk exposure. Without STP services, firms would be forced to manually reconcile their transactions, leaving them exposed to risks throughout the trading day.

5.      MarkitSERV has long been the dominant, if not exclusive, provider of IRS trade processing services. MarkitSERV acquired this dominant position due in large part to its "privileged relationship"[1] with the major Wall Street banks that made markets in IRS. Until it went public in 2014, MarkitSERV's parent company, Markit Group Holdings, was controlled by a group of 16 shareholder banks. This relationship gave MarkitSERV "unparalleled access"[2] to the data and IT infrastructure of the major dealers of IRS, who made significant investments to enable their legacy systems to "talk" to MarkitSERV's systems, and to build out the network infrastructure through which MarkitSERV provided STP services to the vast majority of market participants (both sell-side banks and buy-side firms). By 2010, MarkitSERV had a "virtual monopoly"[3] over IRS trade processing.

6.      The passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") transformed both IRS trading and IRS trade processing. To further its

---

[1]  Markit, *MarkitUSD Interest Rate Curve XML Specification* (Mar. 30, 2009), *at* http://www.cdsmodel.com/cdsmodel/assets/cds-model/docs/Interest%20Rate%20XML%20v1.3.pdf.

[2]  *Id.*

[3]  Bank for International Settlements, *Market structure developments in the clearing industry: implication for financial stability* (Nov. 2010), *at* http://www.bis.org/cpmi/publ/d92.pdf.

goal of bringing more competition and transparency to the IRS market, Dodd-Frank required IRS to be traded on exchanges or electronic "swap execution facilities" ("SEFs"). The law also mandated that IRS be cleared through central counterparty clearinghouses ("CCPs") and reported to entities known as swap data repositories ("SDRs"), such as the Depository Trust & Clearing Corporation ("DTCC").

7.     MarkitSERV has further solidified its monopoly position since 2010. Dodd-Frank's clearing and reporting requirements made the use of post-trade service providers an absolute necessity for all market participants, including those who never have considered using them in the past. Market participants who traded IRS (both sell-side banks and buy-side firms) suddenly needed to connect with CCPs and SDRs after each trade—a time-consuming and expensive proposition.

8.     MarkitSERV seized this opportunity and, leveraging its existing infrastructure and customer base, quickly established itself as a one-stop shop for IRS trade processing. MarkitSERV provides clearing, regulatory reporting, and STP services with real-time updates of IRS life-cycle data. In its own words, MarkitSERV is a "a trade processing platform" whose "[m]iddleware services include a variety of post-trade processing functions, including confirmation, matching, submission of trades to clearing, regulatory reporting, and other post-trade processing."[4] The reality is that MarkitSERV has positioned itself as the middleman on every IRS trade, sitting between market participants and SEFs on the one hand, and CCPs and SDRs on the other.

9.     MarkitSERV's market share of IRS trade processing is now approaching 100%. It has over 2,000 active customers, including sell-side and buy-side firms, that are connected to

---

[4] Markit, *Amendments to Swap Data Recordkeeping and Reporting Requirements for Cleared Swaps; Proposed Rule, 80 Fed. Reg. 52,544,* (Oct. 30, 2015), *at* https://www.markit.com/Company/RegulatoryResponses File?CMSID=9603fc4475054c69bcdca00be7c77349.

its system.[5]  MarkitSERV is an integral "hub" through which the majority of dealers, buy-side firms, and other counterparties transact in the IRS market.  It is essential for anyone providing services to the IRS market to have connectivity to this network via MarkitSERV.  Indeed, connectivity to MarkitSERV is typically a threshold requirement for SEFs such as trueEX and other service providers to onboard clients.

10.     MarkitSERV is unregulated by any U.S. government authority, unlike trueEX and nearly every other party that participates in the OTC derivatives markets, including the relevant market for IRS trade processing.  Regulated entities include SEFs, designated contract markets ("DCMs"), futures commission merchants, CCPs, SDRs, market makers, banks, swap dealers, commodity trading advisors, commodity pool operators, hedge funds, and other asset managers.  Only MarkitSERV, the monopolist, is unregulated.

11.     Plaintiff trueEX was founded by Sunil Hirani, a successful financial technology entrepreneur who has devoted his work to increasing efficiency, transparency, and competition in the derivatives exchanges and OTC markets, including the relevant market for IRS trade processing.  trueEX was one of many SEFs that formed after Dodd-Frank.  trueEX operates a global electronic execution and processing platform for IRS, and is regulated as a SEF and DCM by the U.S. Commodity Futures Trading Commission ("CFTC").  It has the capability to handle cleared swaps in 20 currencies, non-cleared swaps, and IRS options.

12.     trueEX is unique from other SEF platforms in that it also has the capability to provide services in the relevant market for IRS trade processing, such as direct connectivity to CCPs and SDRs, allocations, and trade retrieval.  In fact, market participants that use trueEX can have their trades executed and submitted to CCPs and SDRs on a single platform, with clearing and reporting occurring typically in under one second, increasing efficiency and reducing the

---

[5]   Markit, http://www.markit.com/product/markitserv (last visited May 5, 2017).

operational risks and transaction costs of IRS trading. Therefore, while trueEX is capable of performing certain post-trade services for those trading on its platform in the relevant market for IRS trade processing, it cannot provide all of the essential services performed by MarkitSERV. trueEX thus competes with MarkitSERV with respect to the services it does provide.

13.     MarkitSERV's STP services were licensed by virtually all IRS market participants, who relied on it for real-time STP and risk updates. Receiving STP is essential to market participants who trade IRS, and this is typically facilitated by real-time messaging referred to as the "drop copy" report. But building the technology infrastructure necessary to communicate such real-time updates directly from trueEX to end-users' systems is an extraordinarily complex undertaking, and would require end users to make significant investments of time and money. End users who had already spent the time and money to build the infrastructure necessary to interface with MarkitSERV were not willing to do it again to connect with trueEX. If trueEX wanted to provide real-time updates to clients, it had no choice but to do it through MarkitSERV, whose STP and "middleware" service was the de facto standard for the industry.

14.     In September 2011, trueEX entered into an agreement (the "Services Agreement") with MarkitSERV that gave trueEX access to MarkitSERV's STP service. While trueEX directly reports trades to the CCPs and SDRs, the Services Agreement allowed trueEX to send a "drop copy" report of the trades to MarkitSERV. A "drop copy" report, which includes participants' complete transaction details, is generated in close to real-time and used by participants to manage risk, and for their "golden source" trade register and transaction confirmation. After receiving a "drop copy" report, MarkitSERV passes the information along

to participants, who continue to use MarkitSERV for those services not provided directly by trueEX.

15.    The Services Agreement gave trueEX a lifeline to ramp up onboarding new buy-side and bank clients.  For the next five years, trueEX and MarkitSERV invested significant time, money, and resources in building and fostering a working relationship.  MarkitSERV and trueEX team members had a call every other week to discuss how to improve the parties' relationship, connectivity, deliverables, and product development.  The purpose of this relationship was to maintain a seamless connection so that the parties could continue the workflow between trueEX and MarkitSERV without any interruption.

16.    Around June 2016, in an effort to bring competition and innovation to the market for IRS trade processing, Mr. Hirani formed Plaintiff truePTS.  Mr. Hirani's goal was for truePTS to become a direct competitor of MarkitSERV by providing the same core services— submission to CCPs, reporting of trades to SDRs, and STP facilitation—but using more innovative technology and for a substantially lower price.  In August 2016, truePTS's CEO, Zohar Hod, began meeting with large banks about truePTS's purpose and functionality.

17.    Given MarkitSERV's monopoly over middleware services, including STP connectivity with those who trade IRS, a large percentage of the IRS trades processed by truePTS will have at least one counterparty that uses MarkitSERV.  Thus, truePTS must be able to provide clients with a workflow that does not disrupt the existing workflows of a counterparty who uses MarkitSERV.  To accomplish this, truePTS needs a license agreement for STP connectivity from MarkitSERV.

18.    In January 2017, truePTS approached MarkitSERV with a proposal for an agreement under which MarkitSERV would provide truePTS with STP connectivity.

MarkitSERV told truePTS that it would have its legal department review the proposal, but MarkitSERV never returned with a response to truePTS's proposal. truePTS followed up several times over the next three months. Each time, MarkitSERV told truePTS that its legal department was reviewing the proposal. To date, MarkitSERV has never responded to truePTS's proposal.

19.     By April 2017, 35 firms—most of which were MarkitSERV clients—had taken 150 to 200 meetings with truePTS to learn more about its competitive advantage. Then, on April 13, 2017, just as momentum was building around truePTS, MarkitSERV notified trueEX that it would be terminating its connectivity to MarkitSERV effective May 14, 2017. MarkitSERV gave no reason for the termination.

20.     On an April 18, 2017 teleconference, Karen O'Connor, President and Chief Operating Officer of trueEX, pressed MarkitSERV for an explanation of the termination. MarkitSERV's Managing Director and Global Interest Rates Product Manager, Claire Lobo, told trueEX that it was terminating the Services Agreement because providing "drop copy-only" services (*i.e.*, providing "drop copy" services without also providing services relating to clearing and reporting) was a "low margin business" and was not "commercially interesting."

21.     MarkitSERV's rationale for terminating the Services Agreement changed at a follow-up teleconference, on April 21, 2017. When Ms. O'Connor offered on that call to pay MarkitSERV more money for the same STP service, MarkitSERV CEO Brad Levy responded that MarkitSERV's decision to terminate the Services Agreement "has nothing to do with economics" and "has everything to do with the strategy." When Ms. O'Connor asked what Mr. Levy meant by MarkitSERV's "strategy," Ms. Lobo explained that MarkitSERV wanted trueEX

to use the full panoply of post-trade services provided by MarkitSERV, including submission to CCPs for clearing and reporting to SDRs for regulatory compliance.

22.     This was, in essence, a proposal that trueEX give up its own business model of providing direct connectivity to CCPs and SDRs, in favor of the "normal" workflow that MarkitSERV provides to other clients.  In other words, MarkitSERV was demanding that trueEX not compete with MarkitSERV in the relevant market for IRS trade processing, but instead cede control of the market to MarkitSERV.

23.     One week later, MarkitSERV appeared to change its position.  Concerned for his companies, employees, investors, and clients in the marketplace, Mr. Hirani repeatedly reached out to MarkitSERV to discuss the possibility of some kind of solution.  On April 28, 2017, a little more than two weeks before the Services Agreement was set to terminate, Mr. Levy met with Mr. Hirani at MarkitSERV's offices.  At the meeting, Mr. Levy assured Mr. Hirani that, despite the termination letter, MarkitSERV would not cut off trueEX's STP connectivity on May 14.  Rather, Mr. Levy said, MarkitSERV wanted to enter into a new long-term relationship that "works for you and works for us."  Mr. Levy also told Mr. Hirani that if the parties were not able to reach a new agreement, MarkitSERV would ensure that there was a process in place for an orderly transition that would have "zero to minimal impact" on trueEX's clients and the marketplace.

24.     Absent Mr. Levy's assurances at the April 28 meeting, trueEX would have immediately sought judicial intervention the following week.  But given that the parties had maintained a seamless and productive relationship for over five years to ensure connectivity would not be interrupted, trueEX relied on Mr. Levy's assurances and resolved to work with MarkitSERV to come to a new long-term agreement.

25.     However, on a May 2, 2017 teleconference, MarkitSERV backed away from Mr. Levy's promises.  Ms. Lobo would not confirm Mr. Levy's promise that trueEX's STP connectivity would not be shut off or that MarkitSERV would ensure an orderly transition away from MarkitSERV for trueEX.  MarkitSERV claimed that "the termination of the Services Agreement stands and trueEX will be provided drop copy-only services on a day-by-day basis." Therefore, despite promising trueEX that it could still provide "drop copy" reports to MarkitSERV even in the absence of the Services Agreement, and despite trueEX relying on this promise, MarkitSERV reversed course without any legitimate explanation.

26.     On May 5, 2017, trueEX had another teleconference with MarkitSERV to reach an agreement.   MarkitSERV again reiterated that the Services Agreement would be terminated on May 14, 2017, but that trueEX could have access to MarkitSERV's STP connectivity on an uncertain, day-by-day basis.  Specifically, on the teleconference, Mr. Levy told Mr. Hirani that his intention in this negotiation was to create uncertainty and stress, so as to pressure trueEX to propose a solution that redefined the parties' relationship.  Mr. Levy further enforced the fact that MarkitSERV was not interested in receiving additional money from trueEX for the same services.  When Mr. Hirani asked what would convince MarkitSERV, Mr. Levy said that it was up to trueEX to figure that out.

27.     It is clear now that the assurances Mr. Levy gave Mr. Hirani at their April 28 meeting were designed simply to placate trueEX until May 14, when MarkitSERV will cut off trueEX's STP connectivity.  It is also clear that MarkitSERV's changing explanations for its termination of the Services Agreement are all pretextual.  The real reason MarkitSERV terminated the parties' agreement is obvious: to neutralize the competitive threat MarkitSERV faced from trueEX, and to prevent future competition from truePTS.

28.     MarkitSERV's anticompetitive conduct has caused and will cause immediate irreparable harm to trueEX and truePTS.  If the services provided under the Services Agreement terminate on May 14, trueEX will be compelled to shut down its trading venue.  89% of trueEX's liquidity providers rely on MarkitSERV for STP services.  Additionally, hedge funds, asset managers, endowments, and pension funds that trade on the platform use MarkitSERV for STP services.  These buy-side clients and their counterparties simply will not trade on trueEX if there is no connectivity to MarkitSERV for them to receive real-time updates.

29.     With hardly any activity on its platform, trueEX will have no choice but to close its doors.  All of trueEX's 56 employees will lose their jobs, without warning and through no fault of their own.  As for truePTS, it will also shut down, as it cannot sustain itself without trueEX, which provides all of truePTS's funding and support staff.  And MarkitSERV's refusal to deal with truePTS will make it impossible for truePTS to obtain new funding, because without the STP connectivity that can only be obtained from MarkitSERV, truePTS is not a viable business.

30.     MarkitSERV's conduct has not only caused irreparable harm to trueEX and truePTS.  It has also harmed competition in the IRS trade processing market, with MarkitSERV as a single point of dependency and failure, with the power to dictate who gains access to the marketplace.

31.     MarkitSERV's monopolist status and anti-competitive conduct is consistent with the status and conduct of other subsidiaries of IHS Markit Ltd. ("Markit"), which together control the essential plumbing of the entire OTC derivatives market, while operating as unregulated entities outside of the oversight of the CFTC and the Federal Reserve System.  Markit's unchecked control has harmed and will continue to harm competition, market structure,

interoperability, and impartial access in the entire OTC derivatives market, including the relevant market for IRS trade processing.

32.     Accordingly, Plaintiffs now bring this suit for immediate and permanent injunctive relief.

## PARTIES

33.     Plaintiff trueEX LLC is a Delaware limited liability company with its principal place of business in New York, New York.  trueEX is a SEF and a DCM created in the wake of Dodd-Frank to trade IRS.

34.     Plaintiff truePTS LLC is a Delaware limited liability company with its principal place of business in New York, New York.  truePTS provides services within the relevant market for IRS trade processing, and was created to bring competition to the relevant market for IRS trade processing.

35.     Defendant MarkitSERV Limited is a private limited company with its principal place of business in London, England.  MarkitSERV Limited is a party to the Services Agreement.

36.     Defendant MarkitSERV, LLC is a New York limited liability company with its principal place of business in New York, New York.  MarkitSERV, LLC is the entity that operates MarkitSERV's STP services in the United States.

## JURISDICTION AND VENUE

37.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and injunctive relief against MarkitSERV for the injuries sustained by trueEX and truePTS by reasons of MarkitSERV's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.  trueEX seeks temporary and permanent injunctive relief prohibiting MarkitSERV from terminating its contract to provide connectivity to trueEX.

38.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).

39.     Venue is proper in this judicial District pursuant to 15 U.S.C. § 15 and 28 U.S.C. § 1391.  MarkitSERV resides, transacts business, is found, or has agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

40.     MarkitSERV's activities were within the flow of, were intended to, and had a substantial effect on interstate commerce.

41.     MarkitSERV is subject to personal jurisdiction here because it transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action.

## FACTUAL ALLEGATIONS

### A.     Markit Maintains A Monopoly Over The Market For IRS Trade Processing

42.     As noted, regulations and requirements following Dodd-Frank created a new environment for OTC IRS transactions.  Market participants who trade IRS were now faced with requirements to clear their trades with central clearinghouses, report their trades to SDRs, and execute their trades on SEFs.  These market participants include, on the one hand, major dealer banks such as JP Morgan and Goldman Sachs, and on the other hand, buy-side entities such as pension funds, hedge funds, account managers, proprietary trading firms, insurance companies, and university endowments.

12

43.     In this environment, MarkitSERV engaged in a series of actions to set itself up as the "predominant"[6] provider of trade processing services in the relevant market for IRS trade processing. Indeed, MarkitSERV's own marketing materials describe itself as "a trade processing platform" whose "services include a variety of post-trade processing functions, including confirmation, matching, submission, of trades to clearing, regulatory reporting, and other post-trade processing."[7]

44.     MarkitSERV also created an ecosystem that made the barriers to entry in this market seemingly difficult, if not impossible. To ensure that market participants would face high transaction costs to switch to another competitor, MarkitSERV created a fully-integrated network system that required clients to invest time, money, and resources to build a connectivity system between MarkitSERV and the client. Essentially, having already invested in this fully-integrated system, clients became dependent on MarkitSERV and could not find a cost-efficient way to move to another system. For example, every bank and buy-side firm that truePTS has met with has expressed concern that it would take significant time and money for them to realize the cost savings of switching to truePTS—even though truePTS has offered a pricing schedule that is 60% less expensive than MarkitSERV's pricing.

45.     Because MarkitSERV has an entrenched customer base of over 2,000 buy-side and sell-side firms that have made big investments in the infrastructure to connect with MarkitSERV, given the high transaction cost, these firms are unable or highly unlikely to switch to any competing service wanting to enter the market. MarkitSERV thus has the ability to

---

[6]  MarkitSERV Newsletter, Issue 12 (July 2013), *at* https://content.markitcdn.com/corporate/ResourceManager/PI-smvPvYApTnLKNTSw80g2/d/f/D2jJBfgncS1Luj01UHYWYA2/Content/Documents/Company/IndustryInvolvement/ThoughtLeadership/MKT_MSERV_newsletter_20130712_FINAL.pdf.
[7]  Markit, *Amendments to Swap Data Recordkeeping and Reporting Requirements for Cleared Swaps; Proposed Rule, 80 Fed. Reg. 52,544,* (Oct. 30, 2015), *at* https://www.markit.com/Company/Regulatory ResponsesFile?CMSID=9603fc4475054c69bcdca00be7c77349.

exercise monopoly power over the entire market for post-trade processing. MarkitSERV now faces comes competition from execution venues such as trueEX who provide some (clearing and SDR reporting) but not all of the services that are controlled by MarkitSERV. There is no other independent competitor operating in the market currently providing post-trade processing of IRS like MarkitSERV.

**B.     MarkitSERV's Dominance In The Market Forced trueEX To Rely On MarkitSERV For An Essential Service**

46.     Dodd-Frank also fostered the emergence of SEFs like trueEX. As both a platform to execute IRS trades, as well as a platform that directly competes with MarkitSERV in the provision of sending trades to central clearinghouses and reporting trades to SDRs in the relevant market for IRS trade processing, trueEX recognized early on that it would have to build a voluntary and long-term relationship with MarkitSERV given its dominance in the market.

47.     Most, if not all, of the market participants who trade on trueEX are also clients of MarkitSERV. Although trueEX does not need MarkitSERV to provide the clearing and reporting services upon the execution of an IRS trade, it does need connectivity to MarkitSERV for clients who trade on trueEX but rely on MarkitSERV for "drop-copy" STP service.

48.     For example, when at least one counterparty to an IRS trade on trueEX's platform is a MarkitSERV client, the following workflow happens simultaneously: (1) the counterparties execute the trade on trueEX; (2) trueEX sends the trade to a central clearinghouse; (3) trueEX reports the trade to a SDR; (4) trueEX, through its connectivity with MarkitSERV, sends a "drop copy" report of the trade to MarkitSERV; and (5) MarkitSERV sends that report to the counterparty using MarkitSERV's STP, and MarkitSERV manages and administers the trade throughout its life cycle.

49.     This workflow is illustrated in the diagram below.

## Workflow: one counterparty uses MarkitSERV



50.     However, without the fourth step in the process—connectivity for trueEX to send a "drop copy" of the real-time update to MarkitSERV—the counterparty using MarkitSERV for STP will be blocked from receiving any real-time updates or other services provided by MarkitSERV.

51.     This problem is illustrated in the diagram below.

## Workflow: one counterparty uses MarkitSERV



52.     An execution platform where one counterparty is unable to connect directly to MarkitSERV to get "drop copy" reports via STP is doomed to failure.  All of the services provided by MarkitSERV are essential services.  Without them, participants who use MarkitSERV have no way to automatically update their back-office trading databases to reflect their current financial and risk exposure.  MarkitSERV's STP platform allows for real-time trade

and risk updates, real-time clearing updates and clearing identifiers, and can be used to maintain a "golden source" trade register, *i.e.*, a reference to which data users can turn when they must ensure they have the correct version of a piece of information for purposes of compliance, risk management, accounting, and tax liability.

53.     To ensure access to this essential service, on September 15, 2011, trueEX entered into the Services Agreement with MarkitSERV.  For trueEX, the contract was essential so that it could have connectivity to MarkitSERV to send it "drop copy" reports of real-time updates necessary for STP facilitation.  The Services Agreement does not require (and has never required) trueEX to use all MarkitSERV's IRS trade processing services, and trueEX remained free to compete with MarkitSERV with respect to sending trades to central clearinghouses and reporting trades to SDRs.

54.     Although both parties had the sole discretion to terminate the Services Agreement at any time on 30 days' notice, both trueEX and MarkitSERV engaged in conduct to suggest that neither would exercise its termination rights.

55.     For example, for over the next five years, the parties fostered a long-term and productive relationship.  Beginning on or around February 2014, members from the account management and product teams would have a call every other week to discuss how to improve the connectivity, relationship, future goals, and product development.  Indeed, less than three weeks ago, on April 12. 2017, the teams had a call to discuss any recent status updates.  In fact, even after MarkitSERV had terminated the Services Agreement, the parties had a call on April 26, 2017 to discuss the same.

56.     The purpose of these meetings was simple:  to maintain a seamless relationship so that the connectivity would not be interrupted in any way.  Relying on this understanding with

MarkitSERV, trueEX, for more than five years, continued to operate in its usual manner with MarkitSERV. It would send trades to central clearinghouses and report them to SDRs , and it would send a "drop copy" report of the trade to MarkitSERV, which would then provide other necessary STP services throughout the lifetime of the swap.

### C.   The Creation Of truePTS As A Direct Competitor To MarkitSERV

57.     Beginning in or around June 2016, to bring competition and innovation to the relevant market for IRS trade processing, Mr. Hirani formed truePTS, a sister company of trueEX.  The goal of truePTS was to become a direct competitor of MarkitSERV and provide a suite of services that included many of the same services as MarkitSERV, such as STP facilitation and direct submission to CCPs and SDRs—but with dramatically lower prices and with more next-generation technology.

58.     For example, truePTS intends to move away from the current "affirmation" model for trade processing, in which one party alleges the trade and another party affirms the trade details, to an "automated" model in which trades are matched instantly using a client-defined matching algorithm.  truePTS also intends to use distributed ledger technologies to synchronize trade data across market participants, and to leverage artificial intelligence to identify data mismatches and improve data quality.  With these and other innovations, truePTS promises to bring IRS trade processing into the next generation.

59.     However, as the de facto standard-bearer for STP connectivity, MarkitSERV posed a problem for truePTS.  As noted, MarkitSERV has a network of more than 2,000 active customers across sell-side and buy-side firms.  To compete successfully with MarkitSERV, truePTS must convince those participants to switch from MarkitSERV to truePTS.  This migration would not happen instantly, and it would not be total:  a significant portion of trades submitted to truePTS for processing will involve at least one counterparty who uses

MarkitSERV for STP.  If one participant who has migrated to truePTS executes an IRS trade facing another market participant that continues to use MarkitSERV, truePTS must provide clients with an "interoperability" workflow that ensures that the MarkitSERV counterparty's existing workflows are not disrupted.  To accomplish this, truePTS needs STP connectivity with a "drop copy" solution from MarkitSERV.

60.     In January 2017, truePTS approached MarkitSERV with a proposal for an agreement under which MarkitSERV would provide truePTS with STP connectivity. MarkitSERV told truePTS that it would have its legal department review the proposal, but MarkitSERV never returned with a response to truePTS's proposal.  truePTS followed up several times over the next three months.  Each time, MarkitSERV told truePTS that its legal department was reviewing the proposal.  To date, MarkitSERV has never responded to truePTS's proposal.

61.     Also in or around August 2016, truePTS's CEO, Zohar Hod, began meeting with firms about truePTS's purpose and functionality.  In January 2017, Mr. Hod began to have meetings with larger market participants who are involved with trading IRS and who need providers for IRS trade processing.  Mr. Hod met with banks, buy-side firms, and clearinghouses to discuss the competitive advantage of truePTS over MarkitSERV.  At these meetings, Mr. Hod would provide a presentation about truePTS, and show rate cards reflecting the amount these participants would save if they migrated from MarkitSERV to truePTS.

62.     Mr. Hod attended a meeting with LCH.Clearnet ("LCH"), a leading central clearinghouse, at the Futures Industry Association ("FIA") annual industry conference held in Boca Raton, Florida on March 14-17, 2017.  Almost every major player in the OTC derivatives trade processing market, including MarkitSERV, attend this event every year to explore the

"current state of the cleared derivatives ecosystem, set strategic partnerships and make powerful connections."[8]  In fact, "[m]ore than 1,100 senior-level executives from brokerage firms, asset management firms, international exchanges and regulatory bodies gathered for FIA's most prestigious strategic conference."[9]

63.    A senior executive at LCH wanted to meet with Mr. Hod to discuss truePTS at the FIA conference.  LCH had just launched a new service called SwapAgent, which was a service to reduce the amount of collateral a bank would have to post for an uncleared IRS trade, another service performed in the relevant market for IRS trade processing, and LCH had been asked by some of its board members to inquire whether truePTS could be an alternative to MarkitSERV in providing SwapAgent with a pipeline to process these uncleared IRS trades from SwapAgent to LCH for purposes of clearance.

64.    Mr. Hod's presence at FIA generated a lot of attention.  Mr. Hod spoke with executives at several of the industry's leading firms, including people with close relationships with MarkitSERV.

65.    Even after FIA, Mr. Hod met with several large buy-side and sell-side firms.  For example, on March 22, 2017 Mr. Hod had a meeting with an executive at a major bank to discuss truePTS.  The two discussed gaining access to MarkitSERV, and the executive simply stated that MarkitSERV "could always excuse this disconnection by other means that would not be related to you specifically."  Mr. Hod understood from this that MarkitSERV might retaliate against truePTS by denying service to trueEX.

66.    From March 29 to April 6, 2017, Mr. Hod had several meetings with banks that were MarkitSERV clients to discuss truePTS and the competitive advantage truePTS could offer

---

[8]  FIA Boca 2017 (last visited Apr. 7, 2017), *at* https://boca2017.fia.org/.
[9]  *Id.*

19

in the relevant market for IRS trade processing.  By April 2017, 35 firms—most of which were MarkitSERV clients—had taken 150 to 200 meetings with truePTS to learn more about its competitive advantage.

67.     Although Mr. Hod required individuals whom he met with and discussed truePTS to sign a non-disclosure agreement, as truePTS continued to gain significant interest from MarkitSERV clients, it was only a matter of time until MarkitSERV learned of the competitive threat it faced with truePTS.  Indeed, soon after FIA, on March 20, 2017, Mr. Levy, of MarkitSERV, reached out to Mr. Hod on LinkedIn and invited him to connect, despite having never even met Mr. Hod.

**D.     MarkitSERV Retaliates By Refusing To Deal Without Any Legitimate Business Justification**

68.     On April 13, 2017, trueEX received a letter from MarkitSERV terminating the Services Agreement effective May 14, 2017.  The termination letter provided no explanation for why MarkitSERV was terminating the essential service that allowed trueEX to send MarkitSERV a "drop copy" report and that was necessary for trueEX's business to survive.

69.     Given trueEX's reliance on MarkitSERV's prior dealings, and having just had a status update with trueEX on April 12, 2017 about connectivity and deliverables, trueEX was surprised by the termination.  To inquire as to the basis for the termination, on April 17, 2017, Ms. O'Connor sent MarkitSERV an email stating:  "I received a surprising letter from Markit[SERV] on Thursday and would like to speak to you as soon as possible."

70.     On April 18, 2017, trueEX engaged in a teleconference with MarkitSERV.  Ms. Lobo, who advised trueEX that the Services Agreement was terminated because the "drop copy" workflow between MarkitSERV and trueEX was a "low-margin business" that MarkitSERV

"couldn't afford." Mr. Levy said that the "drop copy" workflow was no longer "commercially interesting."

71.     MarkitSERV's rationale for terminating the Services Agreement shifted at a follow-up teleconference on April 21, 2017. On that call, Ms. O'Connor told Mr. Levy that trueEX was willing to address MarkitSERV's concerns that the "drop copy" workflow was a low-margin business by paying MarkitSERV more for the same service. Mr. Levy responded that MarkitSERV's decision to terminate the Services Agreement "has nothing to do with economics" and "has everything to do with the strategy." Mr. Levy said that the "drop copy" workflow "is not our strategy, it doesn't help us, and we don't want to encourage the workflow."

72.     When Ms. O'Connor asked what Mr. Levy meant by MarkitSERV's "strategy," Ms. Lobo, explained that MarkitSERV wanted trueEX to use "the normal workflow" that MarkitSERV offered, which combined STP, submission to CCPs for clearing, and reporting to SDRs for regulatory compliance. Ms. Lobo said that if trueEX was willing to use the "normal" MarkitSERV workflow, then the parties could have a conversation about a new relationship between MarkitSERV and trueEX.

73.     MarkitSERV's proposal was, in essence, a proposal for trueEX to give up its own business model of providing direct connectivity to CCPs and SDRs, in favor of MarkitSERV's view of what it deems the "normal" workflow in which MarkitSERV performed those services. In other words, MarkitSERV was asking trueEX to stop competing with MarkitSERV. Indeed, on the April 21 call, Mr. Levy told Ms. O'Connor that MarkitSERV's strategy was to be the "middleware for the ecosystem."

74.     The new rationale that Mr. Levy gave on the April 21 call betrays MarkitSERV's real reason for terminating the Services Agreement: to further its anticompetitive and

monopolistic goals by putting trueEX out of business and preventing truePTS from ever becoming a viable competitor.

75.     MarkitSERV has no valid business justification to terminate the relationship with trueEX.  MarkitSERV claims that that the "drop copy" workflow between MarkitSERV and trueEX is not "commercially interesting" or part of MarkitSERV's workflow "strategy."  But MarkitSERV provides this same workflow with two other SEF platforms, Tradeweb and Bloomberg, and has taken no action to terminate those contracts.  By terminating only trueEX's capability to provide "drop copy" reports and rejecting trueEX's offer to increase the amount it pays for this service, MarkitSERV has shown it is willing to sacrifice short-term profits in pursuit of its long-term "strategy" of maintaining and strengthening its monopoly.

76.     Moreover, although trueEX had other contracts with MarkitSERV, such as a swap valuations contract that allowed trueEX to retrieve real-time pricing and other information for one or more interest rate derivative positions, the only contract MarkitSERV chose to terminate was the one that allowed trueEX to compete with MarkitSERV in post-trade services and the one that would kill truePTS as a new market entrant.  Because, as discussed below, truePTS is a start-up company in its early developmental phase, it relies on trueEX for everything from funding, to support, to staff.  If trueEX were to cease to exist, so would truePTS.

77.     Beyond this, MarkitSERV had never expressed any disappointment in the structure or strategy of the parties' workflow contract.  Since the parties entered into the contract, trueEX had paid MarkitSERV hundreds of thousands of dollars for the ability to connect to MarkitSERV and had never missed a payment for fees.  In fact, when MarkitSERV wanted to increase its fee structure with trueEX in 2011 and 2013, trueEX agreed to do so.

78.     Given the parties uninterrupted and voluntary prior course of dealing for over five years, the rational thing would have been for MarkitSERV to raise any issues related to the economics and strategy of the contract and allow for some reasonable timeframe to work through those issues—not simply to immediately terminate the contract and refuse to deal with trueEX. MarkitSERV's decision to terminate the contract shows its willingness to forsake short-term profits to achieve an anticompetitive end, knocking out two competitors in one stroke.

79.     When MarkitSERV saw the significant interest that truePTS was attracting, it did what any ill-intentioned monopolist would do—it used its power to retaliate against trueEX and neutralize any competitive threat faced by trueEX and truePTS.

80.     As to trueEX, MarkitSERV knew that if it terminated trueEX's capability to send "drop copy" reports to MarkitSERV to facilitate STP, MarkitSERV clients, who comprise the majority of trueEX's business, would no longer use the platform to execute IRS trades because they would have no way of protecting themselves from any risk.  MarkitSERV knew that without those clients, trading volume on trueEX would collapse, and trueEX would cease to be a viable business.  MarkitSERV also knew that if trueEX could not operate, there would be one less direct competitor who offered clearing and reporting services in the relevant market for IRS trade processing.

81.     MarkitSERV's predatory intent is clear from the fact that on April 21, 2017, Mr. Levy told trueEX that MarkitSERV might consider "restarting" its relationship with trueEX, but only if trueEX agreed to purchase clearing and reporting services from MarkitSERV—services that trueEX does not need because it has its own capability to submit trades directly to central clearinghouses and SDRs.  In other words, MarkitSERV would consider dealing with trueEX only if trueEX abandoned its business model and allowed MarkitSERV to operate unchallenged

as the middleman standing between trueEX and the rest of the market (*i.e.,* trading counterparties, CCPs, and SDRs), with MarkitSERV collecting its toll on each leg of the transaction.  And by stripping trueEX of its business model, MarkitSERV would also be doing the same to truePTS. If MarkitSERV stood in the middle between trueEX and the rest of the market, the same would be true for truePTS.

82.     The diagrams below illustrate the practical effect MarkitSERV's proposal would have on trueEX:





83.     MarkitSERV knows that terminating its services to trueEX will also destroy truePTS. truePTS is a company in the early development stage. It receives 100% of its funding from trueEX and trueEX staff provides all of its support. If trueEX collapses, so will truePTS.

84.     Like trueEX, truePTS cannot function without connectivity to MarkitSERV for STP services to provide an interoperability workflow between market participants who use truePTS for processing and market participants who use MarkitSERV. For example, in a hypothetical trade, market participant A has migrated to truePTS but market participant B depends on MarkitSERV for post-trade IRS processing. If market participant A executes a voice trade facing market participant B, both counterparties on either side of the trade need real-time updates through their respective STP providers. For this to happen, truePTS and MarkitSERV must be connected to each other, to communicate trade updates as they occur.

85.     Although, beginning in January 2017, truePTS attempted to achieve integration with MarkitSERV, MarkitSERV simply gave it the run-around for three months, stating each time that "[l]egal is reviewing the truePTS request to connect to Markit[SERV]." MarkitSERV's termination notice to trueEX therefore sent a clear message that it had no intention of ever providing connectivity with truePTS, and would do whatever it had to do to prevent current and future competition.

86.     MarkitSERV's predatory intent as to truePTS is clear from the timing of its termination of the Services Agreement with trueEX. It is no mere coincidence that, after working peacefully and productively with trueEX for more than five years, MarkitSERV suddenly terminated the Services Agreement just as major MarkitSERV clients were having their first and advanced detailed diligence meetings with truePTS. MarkitSERV terminated the

Services Agreement with the intent of destroying two competitors—truePTS and trueEX—in one fell swoop.

87.     MarkitSERV also had no legitimate basis to refuse to deal with truePTS. Had MarkitSERV and truePTS entered into an agreement to provide truePTS the capability for purposes of STP facilitation, MarkitSERV would have made a short-term profit off the agreement. By unilaterally refusing to deal without any proffered business justification, there can be no doubt that MarkitSERV was giving up short-term profits to achieve an anticompetitive goal.

88.     MarkitSERV's goal has always been to be the dominant and only player in the market for trade processing services for OTC IRS transactions. In Mr. Levy's own words: MarkitSERV wants to do it all that it can be the "middleware for the ecosystem."

89.     In an attempt to solidify its monopoly, MarkitSERV is currently negotiating long-term, five-year pricing agreements with clients.

90.     Beyond the injuries to trueEX and truePTS, as demonstrated above, because market participants will be prevented from using trueEX and truePTS, they will continue to face little to no choice in the relevant market for IRS trade processing. Without competition, service quality will decline and pricing will rise.

**E.     MarkitSERV Reneges On Its Assurances That It Would Not Cut Off trueEX's STP Connectivity**

91.     After receiving MarkitSERV's termination letter, Mr. Hirani became very concerned about the fate of his companies and the impact that shutting them down would have on his employees and the clients and investors who had backed the company against well-established competitors. Mr. Hirani repeatedly reached out to Mr. Levy to discuss the possibility that the parties could come up with some kind of solution.

92.     On Friday, April 28, 2017, Mr. Levy met with Mr. Hirani at MarkitSERV's offices.  At the meeting, Mr. Levy assured Mr. Hirani that, despite the termination letter, MarkitSERV would not cut off trueEX's STP connectivity on May 14, 2017.  Mr. Levy also said that MarkitSERV was interested in a long term, three- to five-year relationship with trueEX, based on a new agreement that would "work for both of us."  Mr. Levy told Mr. Hirani that that if the parties were not able to reach a new agreement, MarkitSERV would ensure that there was a process in place for an orderly transition that would have "zero to minimal impact" on trueEX's clients and the marketplace.

93.     The following Monday, on May 1, 2017, Mr. Hirani sent an email to Mr. Levy stating that "[m]y team is on standby" and "ready to sit down as early as today" to discuss how to move forward.

94.     trueEX reasonably and foreseeably relied on MarkitSERV's assurances.  Given the parties prior course of dealing for over five years, and given MarkitSERV's knowledge related to the importance of trueEX's ability to send "drop copy" reports to MarkitSERV, trueEX had no reason to believe that MarkitSERV did not mean what it promised.

95.     Had trueEX known that MarkitSERV would back out of its promise to keep the connection going despite terminating the Services Agreement, trueEX would have sought judicial relief sooner to minimize the harm to its company, and/or would have sought to enter into a different relationship with MarkitSERV or sought an alternative strategy with MarkitSERV.  But trueEX did not take these steps believing that MarkitSERV's promise to keep the connection going was genuine.

96.     However, on May 2, 2017, when trueEX contacted MarkitSERV to set up a time to discuss next steps, MarkitSERV refused to confirm Mr. Levy's promises that trueEX's STP

connectivity would not be shut off or that MarkitSERV would ensure an orderly transition for trueEX in the marketplace.  MarkitSERV told trueEX that the termination of the Services Agreement would be effective May 14, 2017.

97.      On May 5, 2017, trueEX , in another attempt to reach an agreement, had a subsequent teleconference with MarkitSERV.  MarkitSERV again reiterated that the Services Agreement would be terminated on May 14, 2017, but that trueEX could have access to MarkitSERV's STP connectivity on an uncertain, day-by-day basis.  Specifically, on the teleconference, Mr. Levy told Mr. Hirani that his intention in this negotiation was to create uncertainty and stress, so as to pressure trueEX to propose a solution that redefined the parties' relationship.  Mr. Levy further enforced the fact that MarkitSERV was not interested in receiving additional money from trueEX for the same services.   When Mr. Hirani asked what would convince MarkitSERV, Mr. Levy said that it was up to trueEX to figure that out.

## FIRST CAUSE OF ACTION

### By Plaintiff trueEX

### (Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)

98.      Plaintiff trueEX repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

99.      MarkitSERV has willfully acquired and maintained monopoly power in the relevant market for IRS trade processing.  MarkitSERV has the power to control prices and exclude competition in the relevant market.

100.    MarkitSERV has something approaching 100% market share of the relevant market for IRS trade processing.  MarkitSERV has willfully acquired and maintained monopoly power in the relevant market for IRS trade processing, by means of predatory, exclusionary, and anticompetitive conduct, including but not limited to refusals to deal, alleged herein.

101.    By terminating the Services Agreement, MarkitSERV has refused to deal with Plaintiff trueEX.  MarkitSERV's conduct has foreclosed access to the relevant market for IRS trade processing.

102.    MarkitSERV's conduct is not justified because it intended to enhance overall efficiency but is intended to exclude an existing and potential competitor.

103.    MarkitSERV's conduct has no legitimate business purpose or procompetitive effect.

104.    Plaintiff trueEX has been and will be injured in its business or property as a result of MarkitSERV's conduct.  Plaintiff trueEX has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiff trueEX has been and will be injured by the harm to competition as a result of MarkitSERV's conduct.

## SECOND CAUSE OF ACTION

### By Plaintiff truePTS

### (Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)

105.    Plaintiff truePTS repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

106.    MarkitSERV has willfully acquired and maintained monopoly power in the relevant market for IRS trade processing.  MarkitSERV has the power to control prices and exclude competition in the relevant market.

107.    MarkitSERV has something approaching 100% market share of the relevant market for IRS trade processing.  MarkitSERV has willfully acquired and maintained monopoly power in the relevant market for IRS trade processing, by means of predatory, exclusionary, and anticompetitive conduct, including but not limited to refusals to deal, alleged herein.

108.   By terminating the Services Agreement, MarkitSERV has refused to deal with Plaintiff truePTS.  MarkitSERV's conduct has foreclosed access to the relevant market for IRS trade processing.

109.   MarkitSERV's conduct is not justified because it intended to enhance overall efficiency but is intended to exclude an existing and potential competitor.

110.   MarkitSERV's conduct has no legitimate business purpose or procompetitive effect.

111.   Plaintiff truePTS has been and will be injured in its business or property as a result of MarkitSERV's conduct.  Plaintiff truePTS has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiff truePTS has been and will be injured by the harm to competition as a result of MarkitSERV's conduct.

## THIRD CAUSE OF ACTION

### By Plaintiff trueEX

### (Attempted Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)

112.   Plaintiff trueEX repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

113.   MarkitSERV has engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to refusals to deal.  MarkitSERV's conduct has had an anticompetitive effect in the relevant market for IRS trade processing.  MarkitSERV's conduct has no legitimate business purpose or procompetitive effect.

114.   MarkitSERV has engaged in that conduct with the specific intent of monopolizing the relevant market for IRS trade processing. MarkitSERV engaged in that conduct with a dangerous probability of monopolizing the relevant market for IRS trade processing. MarkitSERV's conduct has had a substantial effect on interstate commerce.

115.     Plaintiff trueEX has been and will be injured in its business or property as a result of MarkitSERV's conduct.  Plaintiff trueEX has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiff trueEX has been and will be injured by the harm to competition as a result of MarkitSERV's conduct.

### FOURTH CAUSE OF ACTION

### By Plaintiff truePTS

### (Attempted Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)

116.     Plaintiff truePTS repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

117.     MarkitSERV has engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to refusals to deal.  MarkitSERV's conduct has had an anticompetitive effect in the relevant market for IRS trade processing.  MarkitSERV's conduct has no legitimate business purpose or procompetitive effect.

118.     MarkitSERV has engaged in that conduct with the specific intent of monopolizing the relevant market for IRS trade processing.  MarkitSERV engaged in that conduct with a dangerous probability of monopolizing the relevant market for IRS trade processing. MarkitSERV's conduct has had a substantial effect on interstate commerce.

119.     Plaintiff truePTS has been and will be injured in its business or property as a result of MarkitSERV's conduct.  Plaintiff truePTS has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiff truePTS has been and will be injured by the harm to competition as a result of MarkitSERV's conduct.

### FIFTH CAUSE OF ACTION

### By Plaintiff trueEX

### (Promissory Estoppel)

120.    Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

121.    As set forth above, on September 15, 2011, trueEX and MarkitSERV entered into the Services Agreement for trueEX to have the connectivity to provide a "drop copy" report of real-time updates about the clearing and execution status of a trade to MarkitSERV. The Services Agreement allowed both parties the sole discretion to terminate the contract on 30 days' notice. The Services Agreement also has a governing law provision stating that the terms "shall be governed by and construed in accordance with the law of England and Wales."

122.    trueEX and MarkitSERV engaged in conduct to establish that neither party would exercise its respective termination rights under the contract. Relying on this conduct, trueEX made substantial time and resource investments building its relationship with MarkitSERV. For more than five years, the parties regularly engaged in conversation to build and maintain a seamless relationship so that the connectivity would not be interrupted in any way. Indeed, on April 12, 2017, trueEX's and MarkitSERV's product teams had a call to discuss recent status updates. The following day, with no conversation or prior notice, MarkitSERV sent the termination notice to trueEX.

123.    On April 28, 2017, despite having given notice of its termination of Services Agreement, MarkitSERV assured trueEX that it would not cut off the connectivity needed for trueEX to send "drop copy" reports to MarkitSERV for purposes of STP facilitation. According to MarkitSERV, it was interested in a long term, "permanent" relationship with trueEX, based on a new agreement that would "work for both [trueEX and MarkitSERV]." MarkitSERV further

promised that in the event the parties were unable to reach a new agreement, MarkitSERV would ensure that there was a process in place for an orderly transition that would have "zero to minimal impact" on trueEX's clients and the marketplace.

124.    trueEX reasonably and foreseeably relied on this promise.  The parties had developed a relationship that remained uninterrupted for over five years, and had acted in a way to suggest that termination of such an essential service would never be effectuated.  Therefore, trueEX had every reason to believe that MarkitSERV was genuine when it promised to continue to provide access so that trueEX could send "drop copy" reports to MarkitSERV.

125.    trueEX relied on this understanding to its detriment and has been injured.  Absent this reliance and given MarkitSERV's dominance in the market, trueEX would have timely approached MarkitSERV with a different workflow strategy and/or sought judicial relief earlier.

126.    Injustice will be avoided only by enforcing MarkitSERV's to abide by its promise.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and grant the following relief:

A.    judgment that MarkitSERV has violated Section 2 of the Sherman Act;

B.    judgment awarding Plaintiffs treble damages and attorneys' fees under the Sherman Act;

C.    judgment enjoining MarkitSERV from further violations of the Sherman Act;

D.    judgment estopping MarkitSERV from exercising its termination rights under the contract;

E.    any further relief the Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all

issues so triable.


DATED:      New York, New York
            May 8, 2017

                        QUINN EMANUEL URQUHART
                        & SULLIVAN, LLP

                        Daniel L. Brockett
                        Thomas Lepri
                        Kanika Shah (*pro hac vice* forthcoming)
                        51 Madison Avenue, 22nd Floor
                        New York, NY 10010
                        Telephone: (212) 849-7000
                        Facsimile: (212) 849-7100
                        danbrockett@quinnemanuel.com
                        thomaslepri@quinnemanuel.com
                        kanikashah@quinnemanuel.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRUEEX, LLC, and TRUEPTS, LLC | Civil Action No.: _____ |
| Plaintiffs, | |
| -against- | |
| MARKITSERV LIMITED, AND MARKITSERV, LLC. | |
| Defendants. | |

## VERIFICATION

I, Sunil Hirani, being duly sworn according to law, depose and say as follows:

I am founder and Chief Executive Officer of Plaintiff trueEX and founder of Plaintiff truePTS (together, "Plaintiffs"), and I am authorized to make this verification on behalf of Plaintiffs. I have reviewed the foregoing Verified Complaint, and know the contents thereof, and that the same is true and correct to the best of my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.

Date: May 8, 2017
Place: New York, NY

_____
Sunil Hirani