UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRUEEX, LLC, and TRUEPTS, LLC<br><br>            Plaintiffs,<br><br>      -against-<br><br>MARKITSERV LIMITED, AND<br>MARKITSERV, LLC.<br><br>            Defendants. | Civil Action No.: 17-cv-3400 (LAK) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..............................................................................1

STATEMENT OF FACTS ..................................................................................5

    A.    MarkitSERV's Monopoly over the Market for IRS Trade Processing..................5

    B.    trueEX ..................................................................................................7

    C.    trueEX and truePTS Attempt to Compete Directly with MarkitSERV .................9

    D.    MarkitSERV Refuses to Deal with trueEX and truePTS to Further Its Anticompetitive Goals ..............................................................................10

ARGUMENT ....................................................................................................13

I.    trueEX and truePTS Are Likely to Succeed on Their Claims ...........................13

    A.    trueEX and truePTS Are Likely to Succeed on Their Section 2, Sherman Act Claims ........................................................................................13

          1.    Defendants' Refusal to Deal .................................................15

          2.    Defendants Deny Plaintiffs an Essential Facility..........................20

    B.    trueEX Is Likely to Succeed on Its Promissory Estoppel Claim ...........................22

II.    trueEX and truePTS Will Suffer Irreparable Harm Absent Injunctive Relief.................24

III.    The Balance of Hardships Weighs in Favor of Injunctive Relief.....................28

IV.    The Public Interest Would Be Served by an Injunction ..................................29

CONCLUSION...................................................................................................30

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*A.I.B. Express, Inc. v. FedEx Corp.*,
  358 F. Supp. 2d 239 (S.D.N.Y. 2004) ..............................................................15, 19

*Am. Cent. E. Texas Gas Co. v. Union Pac. Res. Grp., Inc.*,
  93 F. App'x 1 (5th Cir. 2004) .........................................................................16, 17

*Am. Civil Liberties Union v. Clapper*,
  785 F.3d 787 (2d Cir. 2015) ...............................................................................13

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
  750 F.2d 1470 (9th Cir. 1985) ............................................................................28

*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
  884 F.2d 69 (2d Cir. 1989) ..................................................................................23

*Asa v. Picometry Int'l. Corp.*,
  757 F. Supp. 2d 238 (W.D.N.Y. 2010) ...............................................................30

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ....................................................................................*passim*

*Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*,
  295 F. Supp. 2d 75 (D.D.C. 2003) ......................................................................28

*Broadway Delivery Corp. v. United Parcel Service of Am.*,
  651 F.2d 122 (2d Cir. 1981) ................................................................................14

*Bronx Auto Mall, Inc. v. Am. Honda Motor Co.*,
  934 F. Supp. 596 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 329 (2d Cir. 1997) ...............26

*City of N.Y. v. Venkataram*,
  2011 WL 2899092 (S.D.N.Y. July 13, 2011) .....................................................30

*Consol. Gold Fields PLC v. Minorco, S.A.*,
  871 F.2d 252 (2d Cir.), *amended on other grounds*, 890 F.2d 569 (2d Cir. 1989)................27

*Creative Copier Servs. v. Xerox Corp.*,
  344 F. Supp. 2d 858 (D. Conn. 2004) .................................................................16

*Cyberchron Corp. v.  Calldata Sys. Dev., Inc.*,
  47 F.3d 39 (2d Cir. 1995) ..............................................................................22, 23

*Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*,
  902 F.2d 174 (2d Cir. 1990) ........................................................................*passim*

*Doctor's Assocs. v. Stuart*,
  85 F.3d 975 (2d Cir. 1996) ..................................................................................30

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451, 453 (1992)................................................................28

*Empire Transit Mix, Inc. v. Giuliani*,
   37 F. Supp. 2d 331 (S.D.N.Y. 1999)...............................................27

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*,
   128 F.3d 59 (2d Cir. 1997).............................................................30

*Int'l Bus. Machines Corp. v. Platform Sols., Inc.*,
   658 F. Supp. 2d 603 (S.D.N.Y. 2009).............................................19

*Jacobson & Co. v. Armstrong Cork Co.*,
   548 F.2d 438 (2d Cir. 1977)...........................................................25

*John E. Andrus Mem'l, Inc. v. Daines*,
   600 F. Supp. 2d 563 (S.D.N.Y. 2009).............................................28

*Juicy Couture, Inc. v. Bella Int'l Ltd.*,
   930 F. Supp. 2d 489 (S.D.N.Y. 2013).........................................28, 29

*Lurgi, Inc. v. Northeast Biofuels, LP*,
   2009 WL 910042 (N.D.N.Y Apr. 2, 2009) .....................................30

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
   708 F.2d 1081 (7th Cir. 1983) ....................................................21, 22

*Mendez v. Bank of Am. Home Loans Servicing, LP*,
   840 F. Supp. 2d 639 (E.D.N.Y. 2012) ............................................24

*NCC Sunday Inserts, Inc. v. World Color Press, Inc.*,
   759 F. Supp. 1004 (S.D.N.Y. 1991)................................................23

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*,
   704 F. Supp. 2d 305 (S.D.N.Y. 2010).............................................30

*New York v. Activis, PLC*,
   2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) .................................14

*Petereit v. S.B. Thomas, Inc.*,
   63 F.3d 1169 (2d Cir.  1995)...........................................................24

*Reuters Ltd. v. United Press Int'l, Inc.*,
   903 F.2d 904 (2d Cir. 1990)........................................................25, 28

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
   754 F. Supp. 2d 616 (S.D.N.Y. 2010).............................................26

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of N.Y.*,
   749 F.2d 124 (2d Cir. 1984)...........................................................28

*Roswell Capital Partners LLC v. Alt. Constr. Techs.*,
   2009 WL 222348 (S.D.N.Y. Jan. 30, 2009) ...................................13

*Safeway Inc. v. Abbott Labs.*,
    2010 WL 147988 (N.D. Cal. Jan. 12, 2010) ...................................................................16

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ....................................................................................................29

*Steward Health Care Sys. v. Blue Cross & Blue Shield of Rhode Island*,
    2014 WL 630678 (D.R.I. Feb. 19, 2014) ..............................................................................16

*Sunshine Cellular v. Vanguard Cellular Systems, Inc.*,
    810 F. Supp. 2d 486 (S.D.N.Y. 1992) ..................................................................................21

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ..................................................................................................14

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995) ......................................................................................................25

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998) ....................................................................................................14

*Tucker v. Apple Computers, Inc.*,
    493 F. Supp. 2d 1090 (N.D. Cal. 2006) ................................................................................16

*U.S. v. BNS Inc.*,
    858 F.2d 456 (9th Cir. 1988) ................................................................................................27

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ..............................................................................................................14

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ........................................................................................................13, 14

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ....................................................................................................18, 19, 20

*Westport Res. Mgmt., Inc. v. Delaura*,
    2016 WL 3546218 (D. Conn. June 23, 2016) ......................................................................30

*Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*,
    224 F. Supp. 2d 657 (S.D.N.Y. 2002) ............................................................................20, 21

### Rules / Statutes

Section 2 of the Sherman Act .................................................................................... *passim*

Plaintiffs trueEX, LLC ("trueEX") and truePTS, LLC ("truePTS") (together, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for a preliminary injunction enjoining Defendants MarkitSERV Limited and MarkitSERV, LLC (together, "MarkitSERV") from denying Plaintiffs access to technology and software essential to their businesses.

## PRELIMINARY STATEMENT

Defendant MarkitSERV is a monopolist in the market for post-trade processing services for over-the-counter trading of interest rate swaps ("IRS trade processing").  Plaintiffs trueEX and truePTS pose a threat to that monopoly, but cannot effectively compete with MarkitSERV without access to a network under its control.  In a transparent effort to choke off that competition and preserve its monopoly, MarkitSERV recently announced that it would forego a steady profit stream by terminating a long-standing arrangement in which trueEX has paid for such access.

At the same time, MarkitSERV has refused even to entertain a proposal from truePTS seeking similar network access as MarkitSERV provides to other market participants who do not pose the same competitive threat.  If MarkitSERV succeeds, Plaintiffs will shut down for good, leaving dozens of employees out of work—not through any fault of their own, but as collateral damage from MarkitSERV's predatory, anticompetitive conduct.

***The IRS trade processing market***:  IRS trade processing involves all of the back-office functions that must be completed after an interest rate swap has been executed, including submitting trades to central counterparty clearinghouses ("CCPs"), reporting trades to entities known as swap data repositories ("SDRs") to fulfill regulatory requirements, confirming trade terms, matching buyer and seller records, and managing a range of other events in the "life cycle" of a swap.  It is vital to the entities entering into swaps that these tasks be automated and

1

occur simultaneously with each transaction, a process known as "straight-through processing," or STP.  IRS market participants rely on real-time STP updates to ensure that their books and records reflect current financial and risk exposure.

MarkitSERV dominates the IRS trade processing market, with a market share over 90%. The lynchpin of its monopoly is its STP network, which MarkitSERV built with massive infrastructure investments financed by the Wall Street dealers who controlled MarkitSERV until 2014.  The cost of building the infrastructure for a new STP network is prohibitively high, and MarkitSERV thus stands alone as an integral "hub" through which most dealers, buy-side firms, and other counterparties transact in the IRS market.  It is essential for any entity providing services to the IRS market to have connectivity to MarkitSERV's STP network.  Otherwise, they could not provide clients with the automated processing and real-time updates critical to those who trade IRS.

Plaintiff trueEX is an IRS trading platform and a provider of certain IRS trade processing services.  trueEX offers some IRS trade processing services that directly compete with MarkitSERV, such as submitting trades to CCPs and reporting trades to SDRs.  trueEX also offers lower pricing for those services.  However, given MarkitSERV's entrenched infrastructure and its existing relationships with virtually all key banks and dealers, trueEX is not able to provide all of the services needed for IRS trade processing.

In particular, trueEX relies on the MarkitSERV network to provide clients with real-time updates of their trading activity via what MarkitSERV refers to as a "drop-copy" report of each trade—essentially, a carbon copy of the details of an IRS trade, which then flow downstream via MarkitSERV's network to clients' back-office books and records.  The majority of trueEX's buy-side clients, and approximately 90% of the dealers who provide liquidity to trueEX,

subscribe to MarkitSERV's STP network and will not trade on any platform that cannot provide connectivity to that network.

***MarkitSERV's Anti-Competitive Actions***:  For more than five years, trueEX has paid MarkitSERV for STP connectivity pursuant to a services agreement entered into in September 2011 (the "Services Agreement"), and the parties have worked together in an amicable and productive relationship throughout that time.  That relationship began to change, however, after trueEX founder Sunil Hirani formed Plaintiff truePTS, a sister company to trueEX, in mid 2016.

Mr. Hirani's vision was for truePTS to compete directly with MarkitSERV by providing the full range of services necessary for post-trade processing for IRS.  Given MarkitSERV's market dominance, however, a large percentage of the IRS trades processed by truePTS will have at least one counterparty that uses MarkitSERV.  In order to process transactions between its clients and such counterparties, which is a capability truePTS must have in order to attract and service clients of its own, truePTS needs access to MarkitSERV's STP, and, in particular, its drop-copy functionality.  truePTS can and will develop its own network, but it needs to be able to send a "drop-copy" to MarkitSERV to have any chance of successful market entry.

In January 2017, truePTS approached MarkitSERV with a proposal for an agreement whereby truePTS would pay MarkitSERV for STP connectivity.  Despite numerous follow-ups, MarkitSERV never responded to truePTS's proposal.  In the same timeframe, truePTS began gathering momentum, and, by April 2017, had taken 150 to 200 meetings with 35 firms, most of which were MarkitSERV clients, to discuss truePTS's competitive advantage.

On April 13, 2017, while still ignoring truePTS's proposal for STP connectivity, MarkitSERV notified trueEX that it would be terminating its Services Agreement, and thus terminating its existing connectivity, effective May 14, 2017.  The notice gave no reason for the

termination, but the reason is obvious, and has since been confirmed by MarkitSERV's CEO, and even its counsel:  MarkitSERV is attempting to neutralize the growing competitive threat posed by trueEX and, now, truePTS.

***Grounds for Preliminary Injunction*:**  The record here creates a compelling case for a preliminary injunction and cries out for the intervention of this Court:

*First*, Plaintiffs are likely to prevail on the merits.  The Supreme Court has held that it is a violation of Section 2 of the Sherman Act for an entity with monopoly power to discontinue an existing business arrangement for the purpose of preventing competition.  That is what has happened here.  MarkitSERV dominates the market for IRS trade processing—more than 90% of all transactions in that space must run through its STP platform.  And MarkitSERV has elected to forego its short term profits, in the form of continued payments from trueEX for STP connectivity under the terms of the Services Agreement, by terminating that connectivity in order to eliminate trueEX as a competitor, and the newly formed truePTS as a potential competitor.

*Second*, there is irreparable harm.  If the Services Agreement terminates and trueEX loses its STP connectivity, trueEX will no longer be able to do business in the IRS trade processing market.  At the same time, truePTS's entry into the processing market will halt, because it cannot sustain itself without trueEX's funding and support staff, and because it will not be able to come on-line as a viable business without the STP connectivity that MarkitSERV refuses to provide.  Of equal, if not greater, concern, competition and consumers will be harmed even more broadly:  with trueEX ceasing to exist as an IRS trading platform, there will be only two remaining competitors in the separate market for electronic trading of IRS (Bloomberg and Tradeweb).

*Third*, the balance of hardships weighs decidedly in favor of preserving the status quo.  MarkitSERV has operated under the terms of the Services Agreement for the past five years, and

has received hundreds of thousands of dollars in fees.  An injunction would merely preserve, for the duration of this litigation, an arrangement MarkitSERV has found satisfactory and profitable over an extended period.  By contrast, in the absence of an injunction, Plaintiffs' businesses will no longer be viable and their employees will lose their jobs.

*Fourth*, it is in the public interest to ensure continued and expanded competition in this market, which is the very thing MarkitSERV is acting to prevent.  trueEX provides innovative services that MarkitSERV does not offer, and provides many of the same services as MarkitSERV at substantially reduced rates.  truePTS, if it were able to come on-line, would provide an even wider array of services, using superior technology at similarly reduced rates.  If MarkitSERV succeeds at blocking these competitors, it will be to the detriment of consumers.

For all of these reasons, Plaintiffs respectfully request that the Court enter an injunction preventing MarkitSERV from denying access to technology and software essential to their businesses.

## STATEMENT OF FACTS

### A.     MarkitSERV's Monopoly over the Market for IRS Trade Processing

MarkitSERV has long been the dominant, if not exclusive, provider of IRS trade processing services, which encompass all of the things that must happen to complete a transaction after an IRS trade has been executed.  *See* Dkt. No. 1 ("Complaint") at ¶¶ 3, 5; *see also* Declaration of Sunil Hirani ("Hirani Decl.") at ¶¶ 22-23.  Historically, these tasks include matching buyer and seller records, confirming the terms of trades, allocating aggregated trades among accounts, and managing other "life-cycle" events such as trade amendments and assignments.  *See* Hirani Decl. at ¶ 13.  Since enactment of the Dodd-Frank, IRS processing now includes handling various reporting requirements, such as sending the trade to a clearinghouse and making sure it is filed with the appropriate swaps data repository.  Above all, IRS trade

processing involves managing the real-time flow of trade information that enables all of the other post-trade workflows to happen seamlessly and without human intervention. *Id.* at ¶ 12; *see also* Complaint at ¶ 3.

MarkitSERV secured its dominant position due in large part to its "privileged relationship"[1] with the major Wall Street banks that act as dealers in IRS. Until it went public in 2014, MarkitSERV's parent company, Markit Group Holdings, was controlled by a group of 16 shareholder banks. *See* Hirani Decl. at ¶¶ 19-21; *see also* Complaint at ¶ 5. This relationship gave MarkitSERV "unparalleled access"[2] to the data and IT infrastructure of the major dealers of IRS, who made significant investments to enable their legacy systems to "talk" to MarkitSERV's systems, and build out the network infrastructure through which MarkitSERV provided STP services to the vast majority of market participants. *See* Complaint at ¶ 5; *see also* Hirani Decl. at ¶ 25. By 2010, MarkitSERV had a "virtual monopoly"[3] over IRS trade processing. *See* Complaint at ¶ 5; *see also* Hirani Decl. at ¶ 22.

The passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") transformed both IRS trading and IRS trade processing. Among other things, Dodd-Frank requires IRS to be traded on exchanges or electronic "swap execution facilities" ("SEFs"), and mandates that IRS be cleared through CCPs and reported to SDRs. *See* Complaint at ¶ 6; *see also* Hirani Decl. at ¶ 10. These new mandates made the use of post-trade service providers a necessity for many market participants. *See* Complaint at ¶ 7; *see also* Hirani Decl. at ¶ 14. As the only provider with an extensive STP network, MarkitSERV was able to leverage its existing infrastructure and customer base to become a necessary participant in

---

[1]  Markit, *MarkitUSD Interest Rate Curve XML Specification* (Mar. 30, 2009), *at* http://www.cdsmodel.com/cdsmodel/assets/cds-model/docs/Interest%20Rate%20XML%20v1.3.pdf.

[2]  *Id.*

[3]  Bank for International Settlements, *Market structure developments in the clearing industry: implication for financial stability* (Nov. 2010), *at* http://www.bis.org/cpmi/publ/d92.pdf.

virtually all trading activity.  *See* Hirani Decl. at ¶¶ 11, 21, 25.  There was simply no plausible way for any competitor or prospective competitor to make the investment necessary to create a similar platform.  *See* Complaint at ¶ 13; *see also* Hirani Decl. at ¶¶ 29, 31.

MarkitSERV's anticompetitive strategy has paid off.  Today, it has a customer base of over 3,000 firms—including more than 90% of the major banks that act as dealers of IRS—and its share in the market for IRS trade processing now exceeds 90%.  *See* Complaint at ¶ 9; *see also* Hirani Decl. at ¶ 23.  MarkitSERV is the sole provider of IRS trade processing for IRS transactions between dealers, and the sole provider of IRS trade processing services for direct trades between dealers and buy-side investors—two categories constituting over 90% of the IRS market.  *See* Hirani Decl. at ¶¶ 22-23.

The only remaining transactions for which MarkitSERV does not control all facets of IRS trade processing are transactions between dealers and buy-side investors, where there is limited competition by SEF operators.  *Id.* at ¶ 24.  But even as to this activity, since these competitors are incapable of providing direct STP connectivity to market participants who subscribe to MarkitSERV's STP network, MarkitSERV has a hand in nearly all trades.  *Id.* at ¶¶ 21, 25, 31.

## B.    trueEX

The passage of Dodd-Frank led to the creation of SEFs, which are electronic trading platforms for IRS.  Following Dodd-Frank, Mr. Hirani founded trueEX, an SEF that could also provide its clients with direct connectivity to CCPs for clearing and SDRs for reporting.  *See* Complaint at ¶ 11; *see also* Hirani Decl. at ¶¶ 26-27.  trueEX thus allowed market participants to have their trades executed, sent to CCPs, and reported to SDRs on a single platform, significantly reducing the transaction costs of IRS trading.  *See* Hirani Decl. at ¶ 27.  Clients found this to be valuable because unlike MarkitSERV, trueEX did not charge clients an additional transaction fee

to have their trades sent to CCPs and SDRs.  *Id.*  Therefore, trueEX was offering some of the same services as MarkitSERV, but at a significantly lower cost.

Although trueEX is capable of providing some IRS trade processing services, it cannot directly provide all of its clients the essential service of STP facilitation.  *Id.* at ¶¶ 28-29.  trueEX is a dealer-to-client platform, meaning that a large dealer bank is a counterparty to virtually every trade executed on trueEX.  *Id.* at ¶ 54.  Given MarkitSERV's entrenchment in the IRS market, particularly among dealers, that means nearly every trade on trueEX's platform involves at least one counterparty that relies on MarkitSERV for STP.  *Id.*  The only entity in a position to provide direct STP connectivity to such counterparties is MarkitSERV itself, which had the advantage of large-scale investment from numerous bank sponsors to build the necessary infrastructure.  Because STP is an essential service for entities engaging in IRS trading, for trueEX to be a viable business, it must have some way to "talk" to MarkitSERV's network and pass on trade information that will flow downstream through the network to market participants' books and records.  *Id.* at ¶¶ 17, 31; *see also* Complaint at ¶ 4.

On September 15, 2011, trueEX and MarkitSERV entered into the Services Agreement, which allowed trueEX to interface with MarkitSERV for purposes of STP facilitation.[4]  *See* Hirani Decl. at ¶ 32.  Under the Services Agreement, trueEX provides MarkitSERV a "drop-copy" report of trades executed on trueEX's platform.  *Id.*  A drop-copy report, which includes

---

[4]   The Services Agreement, which is entitled "MARKITWIRE BROKER TERMS," includes four annexes.  Annex A provided for "Broker Load Services" which allows trueEX to "use the Services to facilitate the generation of a Broker Trade Affirmation of a Broker Load Trade to which it is a party as agent."  Annex B provides for "Broker Load Single Sided Services," which allows trueEX to "use the Services to facilitate the generation of a Broker Trade Record of a Broker Load Single Sided Trade to which it acts as agent."  Annex C provided for "Pre-Accepted Broker Trades Services," which allows trueEX to "use the Service to facilitate the generation of a Broker Trade Affirmation of a Pre-Accepted Broker Trade to which it is a party as agent."  Lastly, Annex D provides for "Execution Platform Trades Services," which allows trueEX to "use the Service to facilitate the generation of a Broker Trade Affirmation of an Execution Platform Trade to which it is a party as agent."  *See* Declaration of Sunil Hirani ("Hirani Decl."), at ¶ 27, Ex. A.

participants' complete transaction details, is generated in close to real-time and used by participants to manage risk. *See* Complaint at ¶ 14. After receiving a drop copy, MarkitSERV's network passes the information through to market participants' trading databases and updates their books and records. *Id.*; *see also* Hirani Decl. at ¶ 33.

Although the Services Agreement could be terminated at the sole discretion of either party, on 30 days' notice, both MarkitSERV and trueEX established a course of conduct demonstrating their intention that the arrangement would remain in place indefinitely—and, indeed, MarkitSERV well understood that continued STP access was essential to trueEX's business. *See* Complaint at ¶¶ 54-56; *see also* Hirani Decl. at ¶¶ 34-35. Starting with the inception of the Services Agreement, trueEX and MarkitSERV product teams had teleconferences every other week to discuss how to improve the connectivity relationship, future goals, and product development. *See* Hirani Decl. at ¶ 36. The teams also have on-site meetings once or twice a year. The product teams have conferred as recently as April 12, 2017. *Id.*

## C.     trueEX and truePTS Attempt to Compete Directly with MarkitSERV

In the middle of 2016, Mr. Hirani formed truePTS—a sister company of trueEX. *Id.* at ¶ 37. truePTS was conceived as a better version of MarkitSERV. While it would provide the same bundle of services as MarkitSERV, such as sending trades to CCPs, reporting the trades to SDRs, and providing direct STP facilitation, it would do so faster and better, at dramatically lower prices. *Id.* at ¶ 38. As a start-up company in developmental stages, truePTS looks to trueEX for funding, support, staff, and resources. *Id.* at ¶ 37. If trueEX were to cease doing business, the same fate would await truePTS.

Like trueEX, truePTS will need at least some connectivity to MarkitSERV to be viable in the IRS trade processing market. For truePTS to process a trade on behalf of a client with a counter-party using MarkitSERV, which is inevitable given MarkitSERV's dominant market

position, truePTS will need the ability to communicate with the trade counter-party by providing a drop-copy report to MarkitSERV, which MarkitSERV, in turn, would forward to its client.  *Id.* at ¶ 39.[5]

Thus, in January 2017, truePTS approached MarkitSERV with a proposal for an agreement under which MarkitSERV would provide truePTS with drop-copy reporting.  *Id.* at ¶ 40.  MarkitSERV told truePTS that it would have its legal department review the proposal. truePTS followed up several times over the next three months, but to date, MarkitSERV has not responded to truePTS's proposal.  *Id.*  It is clear that MarkitSERV has no intention of dealing with truePTS.

In late 2016, truePTS's CEO, Zohar Hod, began meeting with large market participants involved with trading IRS, such as banks, buy-side firms, and clearinghouses, to discuss the competitive advantage of migrating from MarkitSERV to truePTS.  *Id.* at ¶ 41.  At these meetings, Mr. Hod explained the services truePTS could offer and presented rate cards reflecting the fees these market participants would save if they migrated from MarkitSERV to truePTS.  *Id.* By April 2017, 35 firms—most of which were MarkitSERV clients—had taken 150 to 200 meetings with truePTS.  *Id.* at ¶ 42.

**D.    MarkitSERV Refuses to Deal with trueEX and truePTS to Further Its Anticompetitive Goals**

On April 13, 2017, after more than five years and without any explanation or warning, MarkitSERV sent a letter terminating the Services Agreement effective May 14, 2017.  *Id.* at ¶ 43, Ex. B.  MarkitSERV backtracked, however, on April 28, 2017, when its CEO, Brad Levy,

---

[5]    For example, in a hypothetical trade, market participant A has migrated to truePTS but market participant B depends on MarkitSERV for IRS trade processing.  If market participant A executes a voice trade facing market participant B, both counterparties on either side of the trade need real-time updates through their respective STP providers.  For this to happen, truePTS and MarkitSERV must be connected to each other, to communicate trade updates as they occur.

informed Mr. Hirani that MarkitSERV had no intention of cutting-off the support needed for trueEX to send drop-copy reports to MarkitSERV, and that MarkitSERV would make sure there was a process in place for an orderly transition that would have "zero to minimal impact" on trueEX's clients and the marketplace. *Id.* at ¶ 49. Given the parties' long-term relationship, trueEX reasonably believed that MarkitSERV would continue to provide this support, and did not initially seek court relief.

But just days before termination was to become effective, on May 2, 2017, MarkitSERV again reversed itself by declining to stand by Mr. Levy's representations that trueEX's STP connectivity would remain on-line or that MarkitSERV would ensure an orderly transition for trueEX and its clients. *Id.* at ¶ 50. On May 5, 2017, Mr. Levy stated instead that termination would proceed and that STP connectivity would only be provided on an uncertain, day-by-day basis, with the admitted intention of imposing pressure and creating uncertainty for trueEX. *Id.* at ¶ 51. Mr. Levy also made clear that MarkitSERV would not be interested in receiving any additional money from trueEX for the same services it had been receiving. *Id.* On May 8, 2017, MarkitSERV notified trueEX clients who receive STP services through MarkitSERV that "[a]s of Monday, May 15, 2017, Markit[SERV] will no longer be the providing organized trading venue confirmation service for customers executing trades on the TrueEX SEF." *Id.* at ¶ 52, Ex. C.

The only plausible explanation for MarkitSERV's refusal to deal with trueEX and truePTS is MarkitSERV's desire to exclude competition. MarkitSERV has proffered a number of explanations for termination that are plainly pretextual. For example, MarkitSERV explained to trueEX that it was terminating the Services Agreement because the drop-copy workflow between MarkitSERV and trueEX was "customized" and was no longer "commercially

interesting," but MarkitSERV continues to support this very workflow and "strategy" with other SEF platforms, including Tradeweb and Bloomberg (neither of which is pushing a standalone trade processing competitor like truePTS).  *See* Complaint at ¶ 75; *see also* Hirani Decl. at ¶¶ 47-48.

Mr. Levy further confirmed MarkitSERV's predatory intent when he informed trueEX that if trueEX were to enter into a new contract with MarkitSERV to purchase direct connectivity to CCPs and SDRs from MarkitSERV—services that trueEX does not need because it has its own direct connectivity to CCPs and SDRs—only then would MarkitSERV reconnect trueEX's ability to send drop-copy reports to MarkitSERV.  *See* Complaint at ¶ 81; *see also* Hirani Decl. at ¶¶ 46-48.  In other words, MarkitSERV would permit trueEX to continue to do business only if trueEX and truePTS agreed to stop competing with MarkitSERV.  For trueEX and truePTS, this would mean abandoning their business model and allowing MarkitSERV to operate unchallenged as the middleman standing between trueEX and the rest of the market (*i.e.*, trading counterparties, CCPs, and SDRs), with MarkitSERV collecting its toll on each leg of the transaction.

trueEX's business, and truePTS's prospects for coming on line, have already suffered in the short period since MarkitSERV announced its plan to terminate the Services Agreement. Multiple trueEX customers have signaled that they will need to switch providers in the event service is in fact terminated.  *See* Hirani Decl. at ¶¶ 56-61.  As a practical matter, it will make no sense for the vast majority of trueEX customers to remain customers if trueEX can no longer connect to MarkitSERV's STP network.  Liquidity will dry up as dealers dependent on MarkitSERV flee the trueEX platform.  *Id.* at ¶ 55.  The impact on truePTS will also be severe. Given that MarkitSERV controls over 90% of the IRS trade processing market, truePTS will not

be able to attract any customer base unless it can provide the STP connectivity necessary to handle the processing needs of market participants who rely on MarkitSERV for STP. *Id.* at ¶¶ 62-63.

## ARGUMENT

The primary purpose of preliminary, injunctive relief is to maintain the status quo, or the relative positions of the parties, until the court can hold a trial on the merits. *See*, *e.g.*, *Roswell Capital Partners LLC v. Alt. Constr. Techs.*, 2009 WL 222348, at *10 (S.D.N.Y. Jan. 30, 2009). To obtain preliminary injunctive relief, a plaintiff must show: (1) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the plaintiff's favor; (2) the likelihood of irreparable injury in the absence of an injunction; (3) the balance of hardships tips in the plaintiff's favor; and (4) the public interest is not disserved by the issuance of an injunction. *See Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015).

## I.    trueEX and truePTS Are Likely to Succeed on Their Claims

### A.    trueEX and truePTS Are Likely to Succeed on Their Section 2, Sherman Act Claims

To establish a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).[6]

---

[6]   "To make out a successful claim of attempted monopolization, a plaintiff must demonstrate: (1) anti-competitive conduct; (2) intent to monopolize; and (3) a dangerous probability of obtaining monopoly power." *Delaware & Hudson Ry. Co.*, 902 F.2d at 180 (internal citation omitted). Because "[t]hese

The first of these requirements, the possession of monopoly power in a relevant market, is amply demonstrated by the extent of MarkitSERV's dominance in the worldwide IRS trade processing market. *See New York v. Activis, PLC*, 2014 WL 7015198, * 34 (S.D.N.Y. Dec. 11, 2014) (relevant market consists of "relevant product and geographic market"). MarkitSERV processes 100% of IRS trades between dealers executed on IDB platforms and close to 100% of swaps executed on dealer-to-client platforms, such as Tradeweb, Bloomberg, and trueEX. The only competition MarkitSERV has comes from SEFs like trueEX that are capable of handling some but not all of the processing for customers who trade on their platforms. But even for those trades for which trueEX provides certain trade processing services, MarkitSERV is still needed to provide, in almost cases, STP facilities. *See, e.g.*, Hirani Decl. at ¶¶ 21, 23, 25, 28-31.

Thus, MarkitSERV not only handles over 90% of the swap trades that come through the financial system, but it also has the ability to control prices and exclude competitors, which are the hallmarks of monopoly power. *See Grinnell Corp.*, 384 U.S. at 571 ("The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market"); *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391 (1956) (defining monopoly power as "the power to control prices or exclude competition."); *Todd v. Exxon Corp.*, 275 F. 3d 191, 206 (2d Cir. 2001) ("If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power."); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market) (internal citation omitted); *Broadway*

---

elements essentially track those required for a successful monopolization claim," a finding of a monopolization will also lead to a finding of attempted monopolization. *Id.*

*Delivery Corp. v. United Parcel Service of Am.*, 651 F. 2d 122, 129 (2d Cir. 1981) ("a share above 70% is usually strong evidence of monopoly power").

As set forth below, Plaintiffs also satisfy the second element of a claim under Section 2, Defendants' intent to preserve or acquire monopoly power, on two separate grounds.

### 1. Defendants' Refusal to Deal

The antitrust laws do not generally impose on a monopolist a duty to help its rivals survive in the market. Under certain circumstances, however, a monopolist's refusal to cooperate with competitors can constitute anticompetitive conduct and violate Section 2 of the Sherman Act. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985) ("The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.").

In *Aspen Skiing Co.*, the seminal case in this area, the Supreme Court held that a monopolist's refusal to deal with a market participant "as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act." *Id.* at 602. Applying that standard, the Court affirmed a finding of liability against the owner of three Aspen ski mountains based on its decision to discontinue a long-standing arrangement with the owner of a neighboring mountain pursuant to which customers could purchase a pass providing access to all four ski areas. The Court reasoned that the defendants' predatory intent was demonstrated in part by its decision "to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." *Id.* at 603-04. The unilateral termination of a voluntary (and presumably profitable) course of dealing also suggested a willingness to "forsake short-term profits to achieve an anticompetitive end." *Id.* at 608.

Since *Aspen Skiing Co.*, several courts have looked to similar factors—including a defendant's decision to discontinue an ongoing profit stream and its refusal to negotiate in good

faith—as indicia of an impermissible predatory intent. *See, e.g.*, *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 250-51 (S.D.N.Y. 2004) (finding anticompetitive conduct because plaintiff alleged "that in the year in which [defendant] terminated the pricing agreement, the relationship would have generated approximately two million dollars in revenues for [defendant] . . . it [was] reasonable to infer that the course of dealing between the parties was profitable to [defendant] and, thus, the decision to terminate revealed an anticompetitive bent . . . .  Therefore, the allegations of [plaintiff's] complaint fall within the boundary set by *Aspen Skiing* for section 2 liability."); *Am. Cent. E. Texas Gas Co. v. Union Pac. Res. Grp., Inc.*, 93 F. App'x 1, 9 (5th Cir. 2004) (affirming arbitration award that defendant had in engaged in exclusionary conduct by "refus[ing] to negotiate fairly and in good faith with [plaintiff] in order to prevent plaintiff from competing with [defendant] . . . and that this refusal to deal represented a willful maintenance of [defendant's] monopoly power in the relevant market and a violation of the Sherman Antitrust Act, without any lawful business justification.").[7]

The same anticompetitive factors at issue in *Aspen Skiing Co.* and its progeny are on display here.  First, this case also involves a defendant making "an important change in a pattern of distribution" that "had persisted for several years," with "no valid business reason[]" for doing so.  Indeed, the Services Agreement has been in place for more than five years, generating hundreds of thousands of dollars in revenue for MarkitSERV.  *See* Hirani Decl. at ¶ 34.  MarkitSERV nevertheless plans to terminate that agreement, and cut off its own receipt of profits under its terms.

---

[7]   *See also, e.g.*,  *Safeway Inc. v. Abbott Labs.*, No. 07 Civ. 05470, 2010 WL 147988, at *7 (N.D. Cal. Jan. 12, 2010) (plaintiff sufficiently pled refusal to deal claim); *Steward Health Care Sys. v. Blue Cross & Blue Shield of Rhode Island*, No. 13 Civ. 405, 2014 WL 630678, at *4 (D.R.I. Feb. 19, 2014) (same); *Tucker v. Apple Computers, Inc.*, 493 F. Supp. 2d 1090, 1101 (N.D. Cal. 2006) (same); *Creative Copier Servs. v. Xerox Corp.*, 344 F. Supp. 2d 858, 866 (D. Conn. 2004) (same).

Second, just as in *Aspen Skiing Co.*, where the plaintiff offered to pay retail rates to the defendant to continue in the prior business arrangement, MarkitSERV here refused to accept increased payments by trueEX for the same services it has long been receiving. *See* Hirani Decl. at ¶ 46. This is powerful evidence that MarkitSERV's decision was motivated, not by legitimate business concerns, but by a willingness to "forego [] short term benefits" for the sake of "reducing competition" in the IRS trade processing market "over the long run." *Aspen Skiing Co.*, 472 U.S. at 608. MarkitSERV's outright refusal to negotiate with truePTS—much less to "negotiate fairly and in good faith"—leads to the same conclusion. *Am. Cent. E. Texas Gas Co.*, 93 F. App'x at 9.

That MarkitSERV's intent was predatory is buttressed by the statements of its CEO Brad Levy and even by its own defense counsel before this Court. Mr. Levy informed trueEX, during discussions after MarkitSERV announced its intention to terminate the Services Agreement, that if trueEX were to enter into a new contract to purchase direct connectivity to CCPs and SDRs from MarkitSERV—services that trueEX does not need—only then would MarkitSERV provide trueEX STP connectivity and drop-copy reporting. *See* Hirani Decl. at ¶¶ 46-48. Put differently, if trueEX would just remain an execution platform and not compete with MarkitSERV in post-trade processing, MarkitSERV would agree to stay connected.

Defense counsel acknowledged and highlighted this proposal at the hearing on May 15, 2017, calling it "important to remember" that MarkitSERV "offered to let [trueEX] continue doing business using our standard workflow," and that, if trueEX "had agreed to that," it "would not be suffering any injury at all." *See* Declaration of Daniel L. Brockett ("Brockett Decl."), at Ex. 1, 4:23-5:2. This confirms that MarkitSERV chose to discontinue the Services Agreement specifically because trueEX, rather than agreeing to use MarkitSERV's "standard work flow,"

elected to compete with MarkitSERV across a range of services encompassed within that workflow.  In other words, MarkitSERV set a condition for trueEX to continue operating its business; it had to give up services it provided in the relevant market for IRS trade processing so that MarkitSERV could provide those services exclusively.[8]

The timing of MarkitSERV's termination is even more revealing of MarkitSERV's true intentions.  MarkitSERV's termination notice came just as truePTS was gaining traction in the marketplace.  Buy the first quarter of 2017 and into April, truePTS was drawing attention from prospective clients, through successful meetings with dozens of major IRS market participants, including large clients of MarkitSERV, and thus making inroads as a potential direct competitor.  *See* Hirani Decl. at  ¶¶ 41-42.  It is no coincidence that, after working profitably with trueEX for more than five years, MarkitSERV suddenly terminated the Services Agreement just as major MarkitSERV clients were becoming interested in a potential new competitor who would provide the same services as MarkitSERV at a substantially lower cost.  *Id.* at ¶ 38.  MarkitSERV knew that by terminating the Services Agreement it would destroy trueEX's business, and that by refusing even to negotiate for STP connectivity with truePTS, it would destroy that company as well.  MarkitSERV's strategy of "harming its smaller competitor[s]" is precisely what the law forbids.  *Aspen Skiing Co.*, 472 U.S. at 608.

In the years after *Aspen Skiing Co.* was decided, the Supreme Court has provided additional guidance on the "refusal to deal" doctrine, which has served to confirm that the scenario here fits squarely within its scope.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis*

---

[8]   Statements like those from Mr. Levy confirm that MarkitSERV's other purported grounds for terminating the Services Agreement have been pretextual.  For instance, MarkitSERV at one point claimed it was terminating the Services Agreement because it was no longer "commercially interesting" and that the provision of drop-copy reports were "customized" only for trueEX.  *See* Complaint at ¶ 75. That is false:  MarkitSERV continues to support this exact same workflow for other SEF Platforms, including Tradeweb and Bloomberg.  *Id.*

*V. Trinko, LLP*, 540 U.S. 398 (2004).  In *Trinko*, the Supreme Court rejected a claim by a plaintiff phone service provider that the defendant phone company, which controlled the phone network for New York State, had violated Section 2 by refusing to provide the plaintiff with access to that network.  While recognizing that "a refusal to cooperate with rivals can constitute anticompetitive conduct and violate Section 2," the Court reasoned that the plaintiff could not establish predatory intent, because of the absence of the two key factors dispositive in *Aspen Skiing Co*.  *Id.* at 408-09

Specifically, there was no prior relationship between the parties in *Trinko*, and thus no "unilateral termination of a voluntary (and thus presumably profitable) course of dealing," and there was no refusal by the defendant in *Trinko* to accept reasonable compensation.  *Id.* at 409. Both of those factors, however, are present here—MarkitSERV is seeking to terminate a profitable five year relationship, and doing so even though trueEX has offered to increase its fee payments.  *See* Hirani Decl. at ¶ 46.  This case is thus controlled by *Aspen Skiing Co.*, not *Trinko*.  *See also A.I.B. Express*, 358 F. Supp. 2d at 250 (recognizing the factors distinguishing *Aspen Skiing* from *Trinko*, and holding that allegations that defendant FedEx discontinued a profitable arrangement whereby the plaintiff jewelry courier transported gems to FedEx for mailing "[were] sufficiently similar to the facts the Supreme Court considered determinative in *Aspen Skiing* for [plaintiff's] allegation of anticompetitive conduct to survive" a motion to dismiss).[9]

---

[9]  Contrary to Defendants' suggestion at the May 15, 2017 hearing, *see* Brockett Decl., at Ex. 1, 4:9-15, this Court's decision in *Int'l Bus. Machines Corp. v. Platform Sols., Inc.*, 658 F. Supp. 2d 603 (S.D.N.Y. 2009), does not hold otherwise.  Indeed, the same factors the Supreme Court relied on in *Aspen Skiing* were absent in *IBM* as well.  This Court began its analysis by holding that the plaintiff lacked antitrust standing, since—unlike here—the defendant had taken action to terminate an existing arrangement, not with the plaintiff, but with third parties.  *Id.* at 610-11.  The Court then reasoned there had been no actionable refusal to deal because there was no indication that IBM, in refusing to license its patents for an outdated system, had "foregone short term profits … 'to achieve an anticompetitive end.'"  *Id.* at 613-

In sum, this case falls squarely within the *Aspen Skiing Co.* line of authority, and is a prime example of a defendant electing to discontinue an existing, profitable arrangement for the sake of harming competitors or potential competitors and thereby securing or maintaining control over a market.  That is a violation of Section 2.

### 2.    Defendants Deny Plaintiffs an Essential Facility

In addition to refusing to deal with trueEX and truePTS, MarkitSERV has deprived trueEX and truePTS access to an "essential facility" necessary for them to compete in the relevant market for IRS trade processing, which provides an independent basis for finding a Section 2 violation.  *See Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 179 (2d Cir. 1990) ("denial of an essential facility" is "by implication, a violation of [Section] 2."); *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 674 (S.D.N.Y. 2002) ("A refusal to grant access to an essential facility violates the antitrust laws[.]").  To state a Section 2 claim on this basis, a plaintiff must demonstrate: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Id.* (internal citations omitted).  Each element is satisfied here.[10]

---

14 (quoting *Aspen Skiing Co*., 472 U.S. at 610-11).  Rather, IBM had invested "billions of dollars" in a new operating system, and had a clear business purpose in no longer supporting its former technology. *Id.* at 614.  Here, by contrast, MarkitSERV is seeking to forego short term profits, not because of any change in its own technology (there has been none), but simply to preserve its dominant position in the IRS trade processing market.

[10]   The Court in *Trinko* reached no conclusion as to whether the "essential facilities" doctrine applies as a basis for identifying a Section 2 violation, but noted that the doctrine has been adopted in a number of circuits, including this one.  *See Verizon Commc'ns Inc.*, 540 U.S. at 410-11.  The Court further reasoned that the doctrine would not be satisfied in the case before it since there was a regulatory framework pursuant to which a federal agency had "effective power to compel sharing and to regulate its scope and terms," a circumstance not present here.  *Id.* at 411.

*First*, MarkitSERV has exclusive control over the drop-copy STP function, which is essential to any SEF seeking to provide IRS trade processing services (*see* Section A, *supra*). *See Delaware & Hudson Ry. Co.*, 902 F.2d at 179 (a finding of control satisfied the first element); *Sunshine Cellular v. Vanguard Cellular Systems*, *Inc.*, 810 F. Supp. 2d 486, (S.D.N.Y. 1992) ("services have been held to be essential facilities"); *see also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1133 (7th Cir. 1983) (finding a denial of an essential facility where "AT&T had complete control over the local distribution facilities that MCI required. The interconnections were essential for MCI to [others] service.").

*Second*, it is impossible for trueEX and truePTS to "practically or reasonably" duplicate the provision of connectivity to MarkitSERV clients.  Duplicating MarkitSERV's STP infrastructure would require a massive investment of time and money, making it impractical (and unprofitable) from a business standpoint.  *See* Hirani Decl. at ¶¶ 29-31.  But even if the full STP functionality could reasonably and profitably be developed, it would be impossible for a new entrant to implement that technology without continued reliance on MarkitSERV's drop-copy function.  As discussed *supra*, nearly all of the major dealers are locked into MarkitSERV, making it inevitable that at least one party to the trade will use MarkitSERV.  *See also* Hirani Decl. at ¶¶ 28-29, 54.  The only way to coordinate transactions with such counter-parties would be through the transmission of drop-copy reports, which cannot occur without MarkitSERV's cooperation, thus creating additional insurmountable barriers to entry.  *See, e.g.*, *Yankees Entm't & Sports Network, LLC*, 224 F. Supp. 2d at 674 (allegations "that it cannot practically or reasonably duplicate the essential facility due to significant barriers to entry" sufficient to allege a claim under essential facilities doctrine); *see also MCI Commc'ns Corp.*, 708 F.2d at 1133 (finding denial of essential facility where "[it] would not be economically feasible for MCI to

duplicate Bell's local distribution facilities (involving millions of miles of cable and line to individual homes and businesses)[.]").

*Third*, it is indisputable that MarkitSERV is acting to deny trueEX and truePTS access to and use of this essential facility. MarkitSERV has announced its decision to terminate the Services Agreement with trueEX, thus cutting off its STP connectivity, and has refused even to negotiate with truePTS. *See* Hirani Decl. at ¶¶ 52, 40.

*Fourth*, past practice demonstrates it is feasible for MarkitSERV to provide STP connectivity. MarkitSERV provided trueEX with such connectivity uninterrupted for over five years, and continues to provide this facility to Tradeweb and Bloomberg. *See Delaware & Hudson Ry. Co.*, 902 F.2d at 179 ("The fourth element, feasibility, is demonstrated by the fact that [plaintiff] was permitted continuous use of the tracks until the make or buy policy foreclosed that use."). Indeed, it is in MarkitSERV's business interest to continue providing services to trueEX and to make services available to truePTS. *See, e.g., MCI Commc'ns Corp.*, 708 F.2d at 1133 (the "interconnection" for services could have been feasibly provided where "[n]o legitimate business or technical reason was shown for AT&T 's denial of the requested interconnections" and where "it was technically and economically feasible for AT&T to have provided the requested interconnections[.]").

In sum, MarkitSERV's refusal to continue providing trueEX with STP connectivity, and its refusal even to consider a proposal by truePTS to purchase such connectivity, deprives both Plaintiffs of an essential facility, and thus violates Section 2.

### B.      trueEX Is Likely to Succeed on Its Promissory Estoppel Claim

A claim for promissory estoppel has three elements: "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v.*

*Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (internal quotation marks and citations omitted).[11]  Here, each element has been met.

*First*, on April 28, 2017, after MarkitSERV had already terminated the Services Agreement, Mr. Levy nonetheless unambiguously promised Mr. Hirani that MarkitSERV would not cut off the support trueEX would need to send drop-copy reports to MarkitSERV for purposes of STP facilitation.  *See* Hirani Decl. at ¶ 49.  Mr. Levy also told Mr. Hirani that if the parties were not able to reach a new agreement, MarkitSERV would ensure that there was a process in place for an orderly transition that would have "zero to minimal impact" on trueEX's clients and the marketplace.  *Id.*

These unambiguous assurances support a claim.  *See, e.g., Cyberchron Corp.*, 47 F.3d at 44 (insistence on continued performance by stating, "if I have your assurance that we will resolve the issues in the very near future we will proceed[,]" but then "abruptly terminating the transaction[,]" sufficient to satisfy clear and ambiguous element) (internal ellipses and brackets omitted); *see also Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 74 (2d Cir. 1989) (reversing grant of summary judgment on promissory estoppel claim because obligation to bargain in good faith may constitute a clear promise for purposes of such a claim).

*Second*, it was reasonable for trueEX to rely on these promises.  trueEX and MarkitSERV had developed a relationship and worked cooperatively for over five years.  The parties' teams met regularly, and had bi-weekly teleconferences to discuss connectivity, deliverables, and products.  *See* Hirani Decl. at ¶¶ 34-36.  MarkitSERV also understood that the only way trueEX

---

[11]  The Services Agreement states that the terms "shall be governed by and construed in accordance with the law of England and Wales."  *See* Hirani Decl., Ex. A at 19.  However, "promissory estoppel, by definition, is a claim outside the contract and, therefore, the parties' choice of law is not binding[,]" *NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 759 F. Supp. 1004, 1011 (S.D.N.Y. 1991).  Moreover, the Services Agreement was executed in New York.  If the choice of law provision is nevertheless deemed applicable, Plaintiffs are prepared to demonstrate that promissory estoppel under New York and English law are similar, such that the analysis above in text would apply to both.

could provide real-time updates to its clients that rely on MarkitSERV for STP was to do so directly through MarkitSERV via a drop-copy report.

*Finally,* trueEX was injured as a result of relying on MarkitSERV's promise.  Had trueEX known that MarkitSERV would reverse Mr. Levy's assurances, on April 28, 2017, that service would be continued, trueEX would have sought judicial relief sooner, seeking to enjoin MarkitSERV from further pursuing termination of the Services Agreement.  Hirani Decl. at ¶ 50; *cf. Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 655 (E.D.N.Y. 2012) (denying motion to dismiss where defendant could not "say conclusively that [plaintiff] could not have sought or considered other financial alternatives if he did not rely on [the Services Agreement]").  Having lulled trueEX into not initially bringing suit, MarkitSERV was thus free to issue its notice, on May 8, 2017, in which it advised trueEX customers that its STP connectivity was being terminated.

That notice, unsurprisingly, has already harmed trueEX's business.  Following that notice, multiple trueEX customers contacted trueEX seeking to "frontload" transactions – *i.e.*, accelerate trades immediately, in advance of service disruption—and signaling they would need to switch providers in the event service was in fact terminated.  *See* Hirani Decl. at ¶¶ 56-60.  A number of prospective clients, moreover, have expressed concerns related to the potential disruption of service, and signaled that they are unlikely to enroll as trueEX clients with this controversy outstanding.  *Id.* at ¶¶  58-59.

For these reasons, trueEX is likely to prevail on its collateral estoppel claim.

## II.    **trueEX and truePTS Will Suffer Irreparable Harm Absent Injunctive Relief**

trueEX and truePTS face immediate and irreparable harm in the absence of injunctive relief.  It is settled that a major disruption to a plaintiff's business is sufficient to warrant preliminary injunctive relief.  *See Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir.

24

1995) ("Major disruption of a business can . . . constitute irreparable injury."); *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444-45 (2d Cir. 1977) (refusal to deal amounted to irreparable harm for which monetary damages would be inadequate where movant had been in business for over eight years and stood to lose goodwill and present and potential customers if he lost the right to distribute the defendant's products)  Injunctive relief is especially appropriate, moreover, where the availability of a product is "essential to the life of [a] business," because, under these circumstances, "the availability of money damages may be a hollow promise[.]" *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995); *see also Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) (injunctive relief is appropriate where the defendant stops providing a product which constitutes "the lifeblood" of the company, thereby "threaten[ing] [the company's] continued viability").

trueEX cannot survive as a business without connectivity to MarkitSERV's network. Every trade on trueEX involves at least one dealer, and often involves two or three.  As a result, nearly every trade that happens on trueEX's platform includes at least one counterparty that needs MarkitSERV connectivity to receive real-time updates for their books and records.  *See* Hirani Decl. at ¶¶ 54-55.  If trueEX loses the ability to send drop-copy reports to MarkitSERV, it will cause buy-side clients and dealers who use MarkitSERV to leave the trueEX platform and quickly migrate elsewhere.  This would leave trueEX with few, if any, liquidity providers, whose presence on the platform is essential for its success.  *Id.*  Hedge funds and other buy-side entities come to the trueEX platform to trade with dealers.  But if there are no dealers streaming quotes onto its platform, trueEX cannot survive.  Nor would trueEX have any real prospect of re-securing its clients, many or all of whom will be committed elsewhere by the conclusion of this suit.

trueEX is already feeling the effects of the imminent termination of the Services Agreement.  Dealers on trueEX's platform have indicated that they are rethinking their relationship with trueEX, and both dealers and buy-side firms that trueEX has been pursuing as potential clients have indicated that they will not trade on the platform without STP connectivity.  *See* Hirani Decl. at ¶¶ 56-61.  One prospective client has aptly called trueEX's loss of STP connectivity a "deal breaker."  *Id.* at ¶ 58.

MarkitSERV's actions will have an equally severe impact on truePTS.  truePTS relies on trueEX for all of its staffing, support, and funding.  *See* Hirani Decl. at ¶ 37, 62-63.  Without trueEX, truePTS cannot become a viable business.  And without the ability to provide MarkitSERV with drop-copy reports, truePTS cannot become a competitor in the relevant market for IRS trade processing.  *Id.* at ¶¶ 39, 62-63.  The value of this innovative startup in the financial technology ("fintech") sector, and the momentum truePTS had been gathering just prior to MarkitSERV's termination notice, will never be recovered if MarkitSERV terminates the Services Agreement.

Simply stated, MarkitSERV's termination of trueEX's STP connectivity would "obliterate [trueEX's] business," and truePTS's business as well, which is the type of irreparable injury injunctive relief is meant to avoid.  *Bronx Auto Mall, Inc. v. Am. Honda Motor Co.*, 934 F. Supp. 596, 613 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 329 (2d Cir. 1997).  By depriving trueEX of a service its clients depend upon, MarkitSERV is ensuring those clients, as well as prospective clients, will go elsewhere.  Damages would not be an adequate remedy for Plaintiffs' lost business opportunities, and the damage to their goodwill.  *See Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 622 (S.D.N.Y. 2010) (granting an injunction where termination would "negatively impact [plaintiff's] goodwill and business reputation, because

customers will have no choice but to resort to using a substitute product to meet their needs—possibly resulting in a permanent loss of business"); *John E. Andrus Mem'l, Inc. v. Daines*, 600 F. Supp. 2d 563, 572 (S.D.N.Y. 2009) (irreparable harm established where clients would seek alternative option "thereby dashing the goodwill [of plaintiff] . . . [and] placing [the plaintiff] in financial peril that cannot be remedied by monetary damages."); *Empire Transit Mix, Inc. v. Giuliani*, 37 F. Supp. 2d 331, 334 (S.D.N.Y. 1999) (finding irreparable harm because defendants' "action probably will prevent contractors from considering [plaintiff] in sourcing their concrete requirements on future City contracts.  As one could not determine the extent to which [plaintiff] would have obtained such supply contracts, absent the [defendant's] recent action, proof of a damage claim with respect to such lost business would be impossible.").

Harm to competition is an additional form of irreparable injury on this record.  *See Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 257–58 (2d Cir.), *amended on other grounds*, 890 F.2d 569 (2d Cir. 1989) (finding irreparable harm where competition in the relevant market would be reduced because this type of "threatened injury is precisely the type that the antitrust laws were designed to protect against") (citation omitted).  By depriving trueEX and truePTS the ability to send drop-copy reports to MarkitSERV, MarkitSERV has stripped away consumer choice.  Not only will market participants who rely on MarkitSERV for STP services be prevented from executing trades on trueEX, they will never have the opportunity to choose truePTS as a less expensive and technologically superior alternative to MarkitSERV.  MarkitSERV's actions, if not enjoined, would thus cause harm to the IRS trade processing market.[12]  *Id.*; *see also U.S. v. BNS Inc.*, 858 F.2d 456, 465-66 (9th Cir. 1988) (holding that

---

[12]   The termination of the Services Agreement will also harm competition in the separate market for the electronic execution of IRS.  Now, there are only three SEFs in the marketplace where buy-side market participants can trade IRS:  Tradeweb, Bloomberg, and trueEX.  If trueEX is forced out of business by MarkitSERV, only two SEFs will remain.  This result would not be in the public interest.

district court was correct to issue preliminary injunction because, *inter alia*, there would have been substantial harm to competition in its absence).[13]

In sum, trueEX and truePTS have established immediate and irreparable harm.[14]

## III.   The Balance of Hardships Weighs in Favor of Injunctive Relief

The "balance of hardships between the plaintiff[s] and defendants" tips decidedly in favor of trueEX and truePTS. *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 504 (S.D.N.Y. 2013). On the one hand, if MarkitSERV is permitted to continue its retaliatory conduct, trueEX and truePTS will be forced out of business and over 50 employees will lose their jobs. On the other hand, if an injunction is entered, MarkitSERV will only have to continue doing what it is has been doing for the past five years: provide trueEX with STP connectivity and the capability to send MarkitSERV drop-copy reports in exchange for fees paid by trueEX.

The balance of hardships thus weighs heavily in favor of trueEX and truePTS. *See Reuters Ltd.*, 903 F.2d at 909 (finding balance of hardships weighed in favor of injunctive relief because "[defendant] need do only what it has done for the past five years—provide [plaintiff] with news pictures. The hardship, if any, for [defendant] that may result from continuing its

---

[13]   *See also Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) ("A sufficient showing of injury to competition could support a finding of irreparable harm."); *Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*, 295 F. Supp. 2d 75, 95-96 (D.D.C. 2003) (finding irreparable harm where movant demonstrated harm to competition in absence of "status quo" injunction)

[14]   truePTS is also likely to succeed on its own, separate Section 2 claim, based on MarkitSERV's refusal to deal with truePTS. Where a unilateral refusal to deal is done with the purpose of maintaining a monopoly, that refusal to deal will violate antitrust laws. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 453 (1992) (unilateral refusal to deal will violate Section 2 where a defendant takes "exclusionary action to maintains its [] monopoly and use[s] its control [] to strengthen its monopoly share" without a valid business reason). Here, truePTS approached MarkitSERV with a proposal to obtain STP connectivity in January 2017, when Mr. Hod was meeting with banks, buy-side firms, and clearinghouses to discuss the competitive advantage of truePTS over MarkitSERV. MarkitSERV's refusal to even respond to truePTS's proposal, the timing of MarkitSERV's termination of the Services Agreement with trueEX, and MarkitSERV's conditioning of a new agreement with trueEX upon trueEX's withdrawal the IRS trade processing market all demonstrate MarkitSERV's motive for refusing to deal with truePTS: the desire to maintain a monopoly in the relevant IRS trade processing market.

relationship under the Services Agreement pending the outcome of the litigation is, on the basis of the record, insignificant in comparison to the hardships that [plaintiff] faces absent a preliminary injunction."); *see also Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of N.Y.*, 749 F.2d 124, 126 (2d Cir. 1984) (finding balance of hardships tipped in favor of injunctive relief where it was "unlikely that [defendant] [would] suffer greatly if the eleven-year relationship is continued for a short while.  The two owners of [plaintiff's business], on the other hand, stand to lose their business forever.").[15]

## IV.    The Public Interest Would Be Served by an Injunction

Finally, a court must "ensure that the public interest would not be disserved by the issuance of a preliminary injunction." *Juicy Couture, Inc.*, 930 F. Supp. 2d at 505.  This too weighs in favor of injunctive relief, which would advance the public interest.  With trueEX unable to process trades with counter-parties on the MarkitSERV system, and with truePTS unable to come on-line, market participants in need of IRS trade processing services will have fewer companies from which to choose.  The best option for these market participants—the only option as a practical matter—will be to work with MarkitSERV, thereby cementing its monopoly position.

As a consequence of having fewer options, customers will have to pay more for IRS trade processing services and investors will have one fewer choice of trading venues on which to execute swap transactions.  As discussed, *supra*, trueEX does not charge an additional fee to send executed trades to CCPs and SDRs, as MarkitSERV does, which means that these market participants will be subject to costs associated with clearing and reporting trades they would not

---

[15]   Because the balance of hardships tips so decidedly in trueEX and truePTS's favor, immediate injunctive relief is warranted even if trueEX and truePTS were only able to demonstrate serious questions going to the merits rather than a likelihood of success.  *See Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010).

sustain in a more competitive market.  Likewise, Mr. Hirani has conceived truePTS as a less

expensive, and more technologically advanced, alternative to MarkitSERV on a broad range of

IRS trade processing functions.  Hirani Decl. at ¶ 38.  Thus, if truePTS is blocked from entering

the market, participants in that market will lose the prospect of another less expensive

alternative.  The antitrust laws are meant to avoid exactly this type of anti-competitive

consequences.  *See Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59,

121 (2d Cir. 1997) (noting "the Sherman Act's essential purpose: safeguarding consumer

welfare.").

Accordingly, this factor weighs in favor of injunctive relief.[16]

## CONCLUSION

For the foregoing reasons, trueEX and truePTS respectfully request that the Court grant

Plaintiffs' motion for a preliminary injunction, pending a trial on the merits.

---

[16] trueEX and truePTS should not be required to provide a bond as security for the issuance of the temporary restraining order and preliminary injunction.  Courts have broad discretion to deny a bond where there is "no proof of likelihood of harm" to the non-movant.  *See Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996); *see also Westport Res. Mgmt., Inc. v. Delaura*, 2016 WL 3546218, at *5 & n.3 (D. Conn. June 23, 2016); *City of N.Y. v. Venkataram*, 2011 WL 2899092, at *6 n.9 (S.D.N.Y. July 13, 2011); *Lurgi, Inc. v. Northeast Biofuels, LP*, 2009 WL 910042, at *7 n.10 (N.D.N.Y Apr. 2, 2009). Moreover, when the plaintiff has made a strong showing of success on the merits, a bond is not necessary because there will be a lower probability that the injunction was issued in error thus wrongfully harming defendant.  *See N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 345 (S.D.N.Y. 2010).  Here, trueEX and truePTS have a strong likelihood of success on the merits, and MarkitSERV will not suffer any harm from being required to continue providing the same services it has provided for the past five years.  *See Asa v. Picometry Int'l. Corp.*, 757 F. Supp. 2d 238, 247 (W.D.N.Y. 2010) (bond was not necessary because "there [was] little risk of significant harm to either side" where "the injunction does no more than preserve the preexisting status quo, in which the parties were engaged in an ongoing contractual relationship").

DATED:          New York, New York
                May 19, 2017

                                QUINN EMANUEL URQUHART
                                & SULLIVAN, LLP

                                */s/ Daniel L. Brockett*

                                Daniel L. Brockett
                                Adam Abensohn
                                Thomas Lepri
                                Kanika Shah
                                51 Madison Avenue, 22nd Floor
                                New York, NY 10010
                                Telephone: (212) 849-7000
                                Facsimile: (212) 849-7100
                                danbrockett@quinnemanuel.com
                                adamabensohn@quinnemanuel.com
                                thomaslepri@quinnemanuel.com
                                kanikashah@quinnemanuel.com